IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

APR 1 - 2002

Michael N. Milby, Clerk of Court

| | |
|---|---|
| JEFF KURTZMAN, Individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ CIVIL ACTION NO. H-99-779<br><br>CONSOLIDATED WITH |

| | |
|---|---|
| DEBBIE KNOBLUTH, Individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ CIVIL ACTION NO. H-99-836 |

| | |
|---|---|
| DAVID GOLAN, Individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ CIVIL ACTION NO. 99-869 |

#93

| | | |
|---|---|---|
| EMANUEL CATECHIS, Individually and on behalf of all those similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-889 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| SUZANNE P. GOODMAN, Individually and on behalf of all those similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-936 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| DAVID W. MAZONE, JUSTIN M. VANDERPOT, AND BEHRAH NAKHAI, Individually and on behalf of all those similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-937 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

JOSEPH COTRONEO, Individually       §
and on behalf of all those          §
similarly situated,                 §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §        CIVIL ACTION NO. 99-952
                                    §
COMPAQ COMPUTER CORPORATION,        §
ECKARD PFEIFFER, AND EARL L.        §
MASON,                              §
                                    §
            Defendants              §

---

GARY GILMAN, Individually and       §
on behalf of all those similarly    §
situated,                           §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §        CIVIL ACTION NO. 99-967
                                    §
COMPAQ COMPUTER CORPORATION,        §
ECKARD PFEIFFER, AND EARL L.        §
MASON,                              §
                                    §
            Defendants              §

---

VIRGO FAMILY TRUST, by John and     §
Barbara Virgo, on behalf of         §
itself and all those similarly      §
situated,                           §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §        CIVIL ACTION NO. 99-1011
                                    §
COMPAQ COMPUTER CORPORATION,        §
ECKARD PFEIFFER, AND EARL L.        §
MASON,                              §
                                    §
            Defendants              §

---

```
STEVEN KAMMERMAN, Individually    §
and on behalf of all those        §
similarly situated,               §
                                  §
            Plaintiff,            §
                                  §
VS.                               §        CIVIL ACTION NO. 99-1020
                                  §
COMPAQ COMPUTER CORPORATION,      §
ECKARD PFEIFFER, AND EARL L.      §
MASON,                            §
                                  §
            Defendants            §
```

```
ROBERT HONMYHR, Individually      §
and on behalf of all those        §
similarly situated,               §
                                  §
            Plaintiff,            §
                                  §
VS.                               §        CIVIL ACTION NO. 99-1026
                                  §
COMPAQ COMPUTER CORPORATION,      §
ECKARD PFEIFFER, AND EARL L.      §
MASON,                            §
                                  §
            Defendants            §
```

```
NEIL GILLIGAN, RICHARD J.         §
KNEEBONE, AND RUTH L. KNEEBONE,   §
Individually and on behalf of     §
all those similarly situated,     §
                                  §
            Plaintiffs,           §
                                  §
VS.                               §        CIVIL ACTION NO. 99-1097
                                  §
COMPAQ COMPUTER CORPORATION,      §
ECKARD PFEIFFER, AND EARL L.      §
MASON,                            §
                                  §
            Defendants            §
```

- 4 -

LAWRENCE E. BALFUS, Individually §
and on behalf of all those      §
similarly situated,             §
                                §
              Plaintiff,        §
                                §
VS.                             §          CIVIL ACTION NO. 99-1101
                                §
COMPAQ COMPUTER CORPORATION,    §
ECKARD PFEIFFER, AND EARL L.    §
MASON,                          §
                                §
              Defendants        §

---

HERBERT J. HAAS AND JOHN E.     §
CLARK, Individually and on      §
behalf of all those similarly   §
situated,                       §
                                §
              Plaintiffs,       §
                                §
VS.                             §          CIVIL ACTION NO. 99-1112
                                §
COMPAQ COMPUTER CORPORATION,    §
ECKARD PFEIFFER, AND EARL L.    §
MASON,                          §
                                §
              Defendants        §

---

CRAIG HOUSTON AND DEBORAH A.    §
DYCKMAN, Individually and on    §
behalf of all those similarly   §
situated,                       §
                                §
              Plaintiffs,       §
                                §
VS.                             §          CIVIL ACTION NO. 99-1127
                                §
COMPAQ COMPUTER CORPORATION,    §
ECKARD PFEIFFER, AND EARL L.    §
MASON,                          §
                                §
              Defendants        §

---

| | | |
|---|---|---|
| RUTH GRAIFMAN AND JULIUS GRAIFMAN, Individually and on behalf of all those similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-1139 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| HAYMAN SCHWARTZ, Individually and on behalf of all those similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-1161 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, EARL L. MASON, WILLIAM D. STRECKER, AND MICHAEL J. WINKLER, | § § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| ALAN SMITH, Individually and on behalf of all those similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-1174 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

ROBERT C. DANIELS, Individually §
and on behalf of all those §
similarly situated, §
§
          Plaintiff, §
§
VS. §      CIVIL ACTION NO. 99-1178
§
COMPAQ COMPUTER CORPORATION, §
ECKARD PFEIFFER, EARL L. MASON, §
WILLIAM D. STRECKER, AND §
MICHAEL J. WINKLER, §
§
          Defendants §

---

JEANNE E. LIBIT, Individually §
and on behalf of all those §
similarly situated, §
§
          Plaintiff, §
§
VS. §      CIVIL ACTION NO. 99-1204
§
COMPAQ COMPUTER CORPORATION, §
ECKARD PFEIFFER, AND EARL L. §
MASON, §
§
          Defendants §

---

WAYNE LEE, Individually §
and on behalf of all those §
similarly situated, §
§
          Plaintiff, §
§
VS. §      CIVIL ACTION NO. 99-1250
§
COMPAQ COMPUTER CORPORATION, §
ECKARD PFEIFFER, AND EARL L. §
MASON, §
§
          Defendants §

---

STEVEN OSTROW, Individually        §
and on behalf of all those         §
similarly situated,                §
                                   §
            Plaintiff,             §
                                   §
VS.                                §        CIVIL ACTION NO. 99-1281
                                   §
COMPAQ COMPUTER CORPORATION,       §
ECKARD PFEIFFER, AND EARL L.       §
MASON,                             §
                                   §
            Defendants             §

---

ARNOLD SILVERSTEIN AND ROBERT      §
STRUGO, Individually and on        §
behalf of all those similarly      §
situated,                          §
                                   §
            Plaintiffs,            §
                                   §
VS.                                §        CIVIL ACTION NO. 99-1290
                                   §
COMPAQ COMPUTER CORPORATION,       §
ECKARD PFEIFFER, AND EARL L.       §
MASON,                             §
                                   §
            Defendants             §

---

WARREN HILLS, Individually and     §
on behalf of those similarly       §
situated,                          §
                                   §
VS.                                §        CIVIL ACTION NO. H-99-1295
                                   §
COMPAQ COMPUTER CORPORATION,       §
ECKARD PFEIFFER, AND EARL L.       §
MASON,                             §
                                   §
            Defendants             §

---

| | | |
|---|---|---|
| MILTON AND ROSLYN APPLEBAUM, Individually and on behalf of all those similarly situated,<br><br>          Plaintiffs,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br><br>          Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 99-1298 |

| | | |
|---|---|---|
| JULIUS TURNER, Individually and on behalf of all those similarly situated,<br><br>          Plaintiff,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br>          Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 99-1356 |

| | | |
|---|---|---|
| DAVID L. RICHARDS, Individually and on behalf of all those similarly situated,<br><br>          Plaintiff,<br><br>VS.<br><br>COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON,<br><br>          Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 99-1359 |

| | | |
|---|---|---|
| AARON SOLOMON AND MICHAEL ZELMAN, Individually and on behalf of all those similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-99-1376 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| JOSEPH PERRI, Individually and on behalf of all those similarly situated, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-1381 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § | |
| Defendants | § | |

| | | |
|---|---|---|
| THERESA MALDE AND ANGEL L. ROSAS, on behalf of themselves and all others similarly situated, | § § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. 99-1415 |
| COMPAQ COMPUTER CORPORATION, ECKARD PFEIFFER, AND EARL L. MASON, | § § § § § | |
| Defendants | § | |

PERRY DICASPRI, Individually and§
on behalf of all those                §
similarly situated,                   §
                                      §
            Plaintiff,                §
                                      §
VS.                                   §    CIVIL ACTION NO. H-99-1417
                                      §
COMPAQ COMPUTER CORPORATION,          §
ECKARD PFEIFFER, EARL L. MASON,       §
WILLIAM D. STRECKER, RODNEY           §
W. SCHROCK, JOHN T. ROSE,             §
ENRICO PESTATORI, HANS W.             §
GUTSCH, MICHAEL D. HEIL, THOMAS       §
C. SIEKMAN, JOHN J. RANDO, AND        §
MICHAEL J. WINKLER,                   §
MASON,                                §
                                      §
            Defendants                §

W. MARK LANIER, Individually          §
and on behalf of all those            §
similarly situated,                   §
                                      §
            Plaintiff,                §
                                      §
VS.                                   §    CIVIL ACTION NO. 99-1422
                                      §
COMPAQ COMPUTER CORPORATION,          §
ECKARD PFEIFFER, AND EARL L.          §
MASON,                                §
                                      §
            Defendants                §

V. PINNOCK BAILEY, II AND DR.         §
ROBERT W. BAILEY, Individually        §
and on Behalf of All Others           §
Similarly Situated,                   §
                                      §
            Plaintiffs,               §
                                      §
VS.                                   §    CIVIL ACTION NO. 99-1429
                                      §
COMPAQ COMPUTER CORPORATION,          §
ECKARD PFEIFFER, AND EARL L.          §
MASON,                                §
                                      §
            Defendants                §

## MEMORANDUM AND ORDER

Pending before the Court in the above referenced consolidated, actions alleging violations of federal securities law, brought on behalf of investors who purchased the common stock or call options, or who sold put options, of Defendant Compaq Computer Corporation ("Compaq") during the Class Period[1] from January 7, 1999 through April 9, 1999, or who purchased Compaq stock pursuant to or traceable to S-8 registration statements filed with Securities Exchange Commission ("SEC") on September 30, 1998 and March 17, 1998 in connection with an offering of stock to Compaq employees from January 27, 1999 through April 9, 1999, are the following motions:

> (1) Defendant Compaq and individual Defendants Eckhard Pfeiffer and Earl L. Mason's renewed motion to dismiss (instrument #76) Plaintiffs' Second Consolidated and Amended Complaint ("Section 10(b) Complaint" or "Kurtzman Complaint")[2] pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4 et seq.; and

---

[1] Although a class has not yet been certified, for clarity and simplicity the Court refers to the relevant time period as the "Class Period."

[2] Instrument #72. The Kurtzman Complaint asserts claims under Section 10(b) and 20(a) of the Securities Act of 1934 and Rule 10b-5.

(2) Defendants' renewed motion to dismiss (instrument #79) Julius Turner's Second Amended Class Action Complaint ("Section 11 Complaint" or "Turner Complaint")[3] pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the PSLRA, 15 U.S.C. §§ 77z-2 et seq., and supplemental submission (#81).

In its memorandum and order of December 12, 2000 (#66), ruling on Defendants' original motions to dismiss, the Court ordered Plaintiffs to replead in light of the law recognized and applied by this Court to the then controlling complaints. The Court hereby incorporates into this memorandum and order discussion of that law in the earlier ruling as to both the Kurtzman and the Turner complaints. Moreover, more than two years have passed since the Court's order, and additional case law has developed as more courts have addressed the issues and applied legal principles to particular fact situations, thereby providing a better perspective for this Court in reviewing and ruling on challenges to the new amended complaints in this action.

### KURTZMAN COMPLAINT

The Kurtzman Second Consolidated and Amended Complaint alleges that Defendants in a series of purportedly false and misleading announcements made between January 7, 1999 and April 9,

---

[3] The Second Amended (Turner) Class Action Complaint is #73 in the file. Its claims are grounded in Section 11 of the Securities Act of 1933.

1999, presented a glowing picture of Compaq's business while they knew of or recklessly disregarded material adverse facts, some of which were recognized as early as August 1998, that contradicted their public statements and that were only fully disclosed to the market at the end of the Class Period. It asserts that Defendants falsely represented that business was booming, that demand for and sales of Compaq products were strong, that Compaq was successfully integrated with and enjoying synergies from its June 1998 acquisition of Digital Equipment Corporation ("DEC") for approximately $9.6 billion, and that it was in strong competition with Dell for direct sales to customers.

According to the new complaint, from February 1-24, 1999, senior officers sold over one million shares of their holdings of Compaq common stock at prices as high as $47.625 per share, for proceeds of over $48 million. Just afterward, in a "partial disclosure" the actual financial condition of Compaq, Eckhard Pfeiffer and Earl Mason informed Credit Suisse First Boston analyst Michael Kwatinetz that Compaq's product sales in the United States and Europe had declined and were "below plan." After Kwatinetz lowered his earnings forecast for Compaq for the quarter from 36 cents to 31 cents per share, on February 26, 1999 the price per share of Compaq common stock dropped from $41 to $35.375, or $5.525 per share, and over 21% within five days. On April 9, 1999 after trading hours, Compaq finally revealed to the market that its earnings expectations were vastly reduced to 15 cents per share.

The next trading day, April 12, 1999, the stock plummeted to $24 and 1/16, or $6.875 per share.

In its memorandum and order of December 12, 2000, this Court pointed out several pleading deficiencies in the Kurtzman complaint. The Court noted that Plaintiffs, while relying on an August 1998 internal sales forecast that purportedly alerted Defendants to Compaq's declining business status, had failed to plead any specific details, such as who prepared the forecast, who received it, and the specific contents and accuracy of its predictions. #66 at p. 125. The Court also noted that Plaintiffs' reliance on the high level positions held by the individual Defendants at Compaq, without any factual specifics as to the information to which they were exposed, how, and when, also was too minimal and conclusory to satisfy the scienter requirement. Id. The Court additionally observed that Plaintiffs did not allege that two (Andreas Barth and Pfeiffer) of the three officers that purportedly made false statements or misrepresentations sold any Compaq stock or profited in any way from alleged insider trading and that Plaintiffs failed to allege facts that would create any negative inference regarding CEO Eckhard Pfeiffer's resignation. Id. at 126. Nor were any facts alleged demonstrating the involvement of Defendants Winkler and Strecker. Accordingly the Court ordered Plaintiffs to replead and allege "sufficient relevant facts . . . in detail to show how, by what and when Defendants became conscious of Compaq's alleged deteriorating business status so as to support a strong inference of scienter with respect to

each named Defendant to cure the deficiencies pointed out by the Court."

The Second Consolidated and Amended Section 10(b) Complaint has eliminated all individual Defendants except former Compaq Chief Executive Officer and President Eckhard Pfeiffer ("Pfeiffer") and Senior Vice President and Chief Financial Officer Earl L. Mason ("Mason"), both of whom resigned on April 18, 1999, nine days after the end of the Class Period.

In its previous memorandum and order (#66), since the Kurtzman Plaintiffs' section 10(b) claims sounded in fraud, Plaintiffs must satisfy the heightened pleading standards of Rule 9(b) by identifying the specific time, place, contents, speaker, receiver and substance of the alleged false representations and eschew reliance on conclusory allegations. Melder v. Morris, 27 F.3d 1097, 1000 (5th Cir. 1994)("[T]he stringent pleading requirements of Rule 9(b)" "provide defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.").

With respect to the pleading requirements imposed by the PSLRA, 15 U.S.C. § 78u-4(b)(2) ("complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"), since the Court's memorandum and order (#66) was entered, the Fifth Circuit

issued <u>Nathenson v. Zonagen, Inc.</u>, 267 F.3d 400 (5th Cir. 2001).
It concluded that in a section 10(b) complaint, scienter must be
alleged by pleading particularized facts giving rise to a strong
inference of severe recklessness or conscious misconduct.  The
Fifth Circuit also ruled that motive and opportunity pleading is
relevant to, but generally by itself insufficient, to allege
scienter.  The Fifth Circuit thus adopted the scienter standard of
the Sixth Circuit in <u>In re Comshare, Inc. Sec. Litig.</u>, 183 F.3d 542
(6th Cir. 1999), which in essence was the standard that this Court
had applied to Plaintiffs' first complaint.  <u>Id.</u> at 411-12.
Moreover, regarding the scienter requirement, <u>Nathenson</u> defines
"severe recklessness," which "resembles a slightly lesser species
of intentional conduct," as "limited to those highly unreasonable
omissions or misrepresentations that involve not merely simple or
even inexcusable negligence, but an extreme departure from the
standards of ordinary care, and that present a danger of misleading
buyers or sellers which is either known to the defendant or is so
obvious that the defendant must have been aware of it." 267 F.3d
at 408, <u>citing</u> <u>Broad v. Rockwell</u>, 642 F.2d 929, 961-62 (5th Cir.
1981)(<u>en banc</u>).  The Fifth Circuit found in <u>Nathenson</u> that
allegations that a single outside director sold 18.5% of his stock
at times unrelated to any Company announcements at prices far below
what he might have sold them for a few weeks earlier or later was
insufficient to give rise to a strong inference of scienter; it
concluded that "'[i]nsider' trading must be 'unusual' to have
meaningful probative value." <u>Id</u> at 420-21.  <u>Nathenson</u> also made

clear that "normally an officer's position in a company does not suffice to create an inference of scienter."  Id. at 424.

## A. Defendants' Renewed Motion to Dismiss

Defendants' renewed motion to dismiss is based again on failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and failure to satisfy the pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b).  Specifically, they maintain that the new complaint fails to set forth facts sufficient to raise a strong inference of scienter.  Instead, they charge that Plaintiffs largely reiterate their earlier allegations with some additional vague, ambiguous and conclusory allegations that fail to meet the pleading requirements.

In particular, Defendants point out,

[T]here is still an undefined August 1998 forecast allegedly showing an "across-the-board" decline in demand; there is still the implausible allegation that Compaq made a calculated decision to reduce its own income from DEC; there are still unsupported allegations about an allegedly "failing" direct sales initiative; and there are the same improper attempts to presume scienter based on trading, executive positions and the resignations of Compaq personnel.  And, overall there is precisely the same conclusory notion that Defendants "must have known" in January and February that Compaq's business was deteriorating such that it would be impossible for it to meet its business goals.

#77 at p. 3.

Defendants insist that the new complaint's allegations about the August 1998 internal sales forecast, known internally as

the "Plan of Record," which Plaintiffs generally assert was given to "Compaq's senior executives, including Individual Defendants" and which showed that "sales of Compaq's PC's were expected to decline across the board," is still vague, insider information that fails to identify with the requisite specificity the preparer, the receivers, and the specific contents and accuracy of its predictions. Plaintiffs add only irrelevant background information about Compaq's internal structure and more, equally conclusory assertions, such as that Defendants received daily and weekly reports (contents unspecified) that demonstrated a weakening demand and declining sales (no definition and no details provided) for Compaq's PC products or that Compaq regularly prepared various reports (contents unspecified). Plaintiffs fail to identify which products, of which Compaq had a broad array, were involved, when, where, and why. Nor do Plaintiffs measure in any objective terms the "weakening demand" and "declining sales" or explain why any deterioration was not correctable within a reasonable time, i.e., that it was merely a short-term fluctuation in business that would not interfere with Compaq's ability to meet its business goals, to support Plaintiff's allegation that Defendants knew ahead of time that business conditions would cause a major shortfall. Nor do Plaintiffs plead any facts indicating that anyone at Compaq interpreted the sales reports or the demand projections as inconsistent with, or requiring any modification of, Compaq's publicly stated business goals for the quarter or for the year. Defendants maintain there is no basis here for a strong inference

of scienter for securities fraud. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 n.38 (1st Cir. 1996)(allegations regarding internal reports "may speak to the question of how defendants might have known what they allegedly knew, but absent some indication of the specific factual content of any single report generated by the alleged reporting system, do not independently provide a factual basis for inferring any such knowledge."); Bryant v. Avado Brands, Inc., 100 F. Supp.2d 1368, 1379 (M.D. Ga.)(fact that internal reporting system produced sales reports containing adverse information was "of little probative value"; "[t]o accept Plaintiffs theory--that Defendants must have known that expectations could not be met because of an internal reporting system--would result in an inference of scienter being available in any case in which a company with a reporting system failed to meet forecasted expectations."), rev'd and remanded on other grounds (dismissal without leave to amend was an abuse of discretion), 252 F.2d 1161 (11th Cir. 2001); Eizenga v. Stewart Enterprises, Inc., 124 F. Supp.2d 967, 982, 985-86 (E.D. La. 2000)(Rejecting as conclusory and insufficient to give rise to a strong inference of scienter Plaintiffs' allegations that "Individual Defendants closely monitored the Company's performance via detailed reports that were generated on a daily, weekly and monthly basis. Stewart Enterprises' financial department also distributed monthly financial reports comparing actual financial results to projected results. Thus, the Individual Defendants knew where the Company stood in terms of the sale of and demand for its product as well as

actual results compared to budget."), *citing* <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000)("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. . . . Thus, allegations that the defendants should have anticipated future events and made certain disclosures earlier than they did do not suffice to make out a claim of securities fraud. . . . Where the plaintiffs contend that the defendants had access to [facts contrary to public statements], they must specifically identify the reports or statements containing this information."), <u>cert. denied</u>, 531 U.S. 1012 (2000); <u>In re Baker Hughes Securities Litig.</u>, 136 F. Supp.2d 630, 647-48 (S.D. Tex. 2001)(finding allegations that "senior officers . . . received daily, weekly and monthly financial reports to apprise them of the true financial status of Baker Hughes" to be "the type of generalized allegations routinely rejected as failing to raise a strong inference of scienter. . . . In pleading that the Defendants possessed reports containing adverse information which was subsequently concealed, the Plaintiffs must identify those reports. . . . [T]he Plaintiffs fail to further specify the contents of the alleged reports' information, and how or why the Defendants were reckless or consciously misbehaved with respect to this information."); <u>San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.</u>, 75 F.3d 801, 812 (2d Cir. 1996)("Plaintiffs' unsupported general claim of the reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."), *citing* <u>Serabian v. Amoskeag Bank</u>

- 21 -

Shares, Inc., 24 F.3d 357, 365 (1st Cir. 1994)(requiring Plaintiffs to "specifically identify the internal reports and the public statements underlying their claims, providing names and dates"), and Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993)("[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which officers reviewed them.").

Similarly, Defendants object, Plaintiffs have failed to plead specific, revealing facts regarding the alleged "Plan of Record," an annual sales forecast prepared by unnamed senior Compaq officials based on a high-level review of Compaq's projected market share, sales, and average unit pricing. Plaintiffs do not identify what it said (or if it even predicted a decline in sales in the first quarter of 1999), when it was prepared, when it was issued, and how it relates to Plaintiffs' allegations of fraud.

Although Plaintiffs allege that Defendants attended a series of meetings (with no dates or locations specified) during the Class Period and reviewed "other daily and weekly data" that "also indicated weakening demand and sales decline," they do not assert that either Pfeiffer or Mason attended these meetings, only that unidentified "vice presidents who reported to Individual Defendant Mason" attended. Defendants characterize such pleading as improper "scienter by association," which in essence is an unfounded presumption that a high level position implies knowledge,

which the Court and the Fifth Circuit have explicitly rejected. Again no specific facts or numbers to define the problems allegedly being experienced by Compaq are alleged. For instance, although Plaintiffs generally point to inventory backlogs, increasing returns of unsold Compaq PCs by Compaq resellers, and rising inventories of spare parts, they never state what particular inventory was backlogged and to what extent it affected Compaq's operations, or provide numbers to support allegedly increasing returns of PCs and inventories of spare parts, or explain why the PCs were being returned, which spare parts were involved, and how these problems were related to demand for Compaq products. Nor do Plaintiffs demonstrate with particularity how these alleged problems numerically affected Compaq's quarterly financial results in the context of expected orders or normal increases in the third month of a quarter. In other words, Plaintiffs fail to identify the significance of any of these problems in view of the fact that Compaq constantly faces and deals with fluctuations involving <u>inter alia</u> inventory, supplies and product returns. Plaintiffs must, but have failed to, plead facts that show not only that difficulties existed and that Defendants were aware of them, but that these problems were sufficiently severe that they could not be addressed by corrective measures taken within the quarter, thereby giving rise to an obligation to disclose them. In sum, Defendants urge, "[T]he Renewed Complaint does not contain a single fact demonstrating what specific information was available to Defendants at the time of any allegedly false statement." #88 at 13.

Moreover, Defendants charge that Plaintiffs' allegations regarding Compaq's deliberate interference with and reduction of the value to be gained from its integration with DEC are both implausible and conclusory. Repeated in the new complaint is the allegation that just after Compaq acquired DEC for 9.6 billion dollars in June 1998, it notified DEC's sales force that there would be a change in their compensation program, effective January 1, 1999, that "would potentially reflect lower compensation terms." Plaintiffs further allege that the sales force then focused on sales that would close before the year's end and "ignored sales for the first quarter of 1999," so that DEC's sales for the first quarter of 1999 "were certain to be below expectations." Plaintiffs also assert that Compaq instructed DEC's sales force to focus on selling Compaq's NT-based products instead of DEC's Unix-based computers in advertising and promotional material.

Defendants complain that in these conclusory allegations Plaintiffs fail to identify how the notification to the DEC sales staff was made, who at Compaq was responsible for deciding to issue the notification, or who received the notification. Nor do Plaintiffs provide any details about the underlying compensation program for these employees, for either the existing program in effect during the period from June 1998 to January 1, 1999 or the alleged new one thereafter. Nor do Plaintiffs identify a single "potential sale" that DEC's sales staff allegedly "ignored." Nor do they explain why working diligently to close sales at the end of 1998 is anything but normal sales force behavior, i.e., closing as

many deals as possible.  Neither do Plaintiffs plead any facts showing that any specific sale could have been successfully closed had it not been "ignored."

More importantly, urge Defendants, in this and the previous complaint the scheme alleged by Plaintiffs is totally noncredible and defies common sense.  Why would Compaq spend nearly ten billion dollars to acquire DEC and then sabotage itself by intentionally reducing rather than expanding income from DEC and its sales force?  Given the bizarre nature of such a claim, Defendants insist that it must be scrutinized with even greater care or be rejected.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)("Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible"); Coates v. Heartland Wireless Communications, Inc., 55 F. Supp.2d 628, 643 (N.D. Tex. 1999)(rejecting plaintiffs' theory of fraud because it "defies common sense" and is "facially implausible"); In re Green Tree Fin. Corp. Stock Litig., 61 F. Supp.2d 860, 873 (D. Minn. 1999)(rejecting plaintiffs' theory of fraud on the ground that it "makes no sense"); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990)(where "[p]laintiffs' view of facts defies economic reason . . . it does not yield a reasonable inference of fraudulent intent").  Defendants highlight the fact that Plaintiffs fail to provide pertinent facts that might ground this allegation in reality:  they do not state who gave the alleged instruction to the sales force, when in 1998 it was given, to whom

- 25 -

it was given, who created the policy, who endorsed it, or, most importantly, why Compaq management would have considered pursuing such a self-destructive path. Nor does it make sense why Compaq officials would have notified the sales force in June 1998 and then maintained the current compensation structure throughout 1998 so that the sales force might ignore it until 1999. Indeed, Defendants note, Plaintiffs concede that DEC sales and overall margins increased in the fourth quarter of 1998. Although Plaintiffs plead that by early January an overall decline in sales was reflected in weekly sales reports, as noted they plead no specific facts about these reports: not a single report is identified, authors are not identified, recipients of the reports are not identified, the contents and accuracy are not specified, and no point of comparison is provided, i.e., whether the sales declined as compared to the prior year, the prior quarter or some other specified time period.

As relates to DEC, Plaintiffs have alleged that "weekly sales reports demonstrated that DEC sales had declined by as much as 30-40%." Complaint at par. 40. This conclusory allegation is unsupported by any facts that might raise an inference of scienter, argue Defendants. Plaintiffs fail to identify a single report showing such a decline, fail to discuss the contents of such reports or compare them to subsequent or prior weekly reports, and again fail to identify the period of comparison for the alleged decline. Nor do they specify whether the decline was projected for the first quarter, the first month of the first quarter, the whole

year or some other period.  Plaintiffs also do not identify on what the report was supposedly based or explain how firm its numbers were.  Indeed, elsewhere in the complaint Plaintiffs allege that the decline in high-end sales during the Class Period turned out to be only 5-10% when compared with the prior year.[4]  Complaint at par. 54.

Furthermore, Defendants argue, Plaintiffs assert that "former DEC customers were turning to competing manufacturers offering Unix-based computers, including Hewlett-Packard." Defendants object that Plaintiffs fail to identify any of these former customers or state how many sales or how much revenue was lost as a result.  Without an explanation of the overall effect of the claimed lost sales, there is no basis to conclude that because some former customers bought computers from other manufacturers, Defendants therefore knew, as early as January 1999, that overall high-end computer sales would not meet projections for that quarter or for the year.  Plaintiffs have not presented any facts that might suggest that sales early in the quarter are a reliable predictor of the entire quarter's results, no less the year's.

Although Plaintiffs offer "vague" statements from an August 16, 1999 interview of Compaq's new CEO, Michael Capellas, by <u>Fortune</u> magazine (Complaint at par. 41 and Def.'s Ex. 5 in Appendix

---

[4] Plaintiffs respond that Defendants are confusing two separate statements.  DEC computer sales did decline by 30-40% in the first quarter of 1999 (par. 40 of the new complaint); revenue from high-end computer systems, which included DEC servers, Tandem Computer Inc. servers, and other high end servers, which carry high gross margins of 40-50%, were actually down 5-10% the first quarter of 1999 (par. 54).  #86 at 26 n.27.

to Renewed Motion to Dismiss, #78) regarding inter alia the mistakes that Compaq had made in the past year or so, Defendants maintain that courts have consistently held that such post-Class Period statements, made with the benefit of weeks or months of hindsight, thus also constituting impermissible pleading by hindsight, are not probative of the mental state of individuals making allegedly fraudulent statements during the Class period. See, e.g., Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1020 n.4 (5th Cir. 1996)(disclosure regarding corporate defendant's earnings in post-class period Form 10-K was not an "admission" that prior disclosures were misleading because "[s]uch an allegation tells us nothing about whether the Defendants knew any of their prior disclosures 'were materially false or misleading when made'"); Tarica v. McDermott Int'l, Inc., No. Civ. A. 99-3831, 2000 WL 1346895, *6-7 (E.D. La. Sept. 19, 2000)(post-class period statements do not raise a strong inference of scienter because they do not show "who knew, what they knew and when they knew it"); In re Technical Chems. Sec. Litig., No. 98-7334-DIMITROULEAS, 2000 WL 1222025, *7 (S.D. Fla. July 3, 2000)(same); In re Vantive Corp. Sec. Litig., 110 F. Supp.2d 1209, 1217 n. 14 (N.D. Cal. 2000)(same); Wallace v. Systems & Computer Tech. Corp., No. C 98-20434 JF, 1997 WL 602808, *17 & n.39 (E.D. Pa. Sept. 23, 1997)(same); In re Read-Rite Corp. Sec. Litig., 2000 WL 1641275, *4 (N.D. Cal. Oct. 13, 2000)(unpublished disposition)(same). Here, not only have months passed since the challenged statements at issue in this suit were made and the Class Period ended, but the

interview is with the successor to Pfeiffer, not the speaker, himself, and Capellas is not alleged to have been involved in any way with the actions at issue in this suit.

Moreover, in the new complaint, Defendants maintain, in spite of the Court's order that Plaintiffs provide factual specifics, Plaintiffs reiterate most of their conclusory arguments about the failure of Compaq's hybrid (multi-channel) distribution system combining direct and indirect sales, especially its problems with its direct sales initiative[5] and Compaq's giving in to the valued added resellers' ("VARs'") demands that direct prices be kept higher than necessary so that the VARs would not lose sales, thereby causing a reduction in direct sales. Plaintiffs have

---

[5] Plaintiffs explain that their direct sales allegations relate to two different programs: (1) Compaq's "configure-to-order" ("CTO") program to sell directly to individual customers configuring computers in accordance with what the customer wanted; and (2) the direct sales initiative to small and medium business owners and consumers that involved no CTOs but "built-to-order" units sold either directly to the customer or through valued added resellers ("VARs"), an initiative Compaq dubbed "Direct Plus."

The new complaint asserts that Compaq's problem with the CTOs was its inability to keep a chain of suppliers for the PC components, in particular the loss of a hard-disk-drive agreement with Western Digital and Compaq's inability to find an alternate supplier.

With the second, built-to-order program, the price Compaq charged was the same regardless of whether the customer purchased directly or through a VAR. Therefore where the customers purchased through a VAR, the VAR's mark-up for expenses and profits was 6% or more. Because the price was the same, those who purchased direct gained no price advantage by doing so and, indeed, subsidized the VAR program. The complaint asserts that the VAR distribution channel therefore caused Compaq a greater overhead. Thus Compaq was at a competitive disadvantage because of this "channel conflict" with its VARs and allegedly tried to reduce VAR sales incentives, thereby causing VARS to "rebel" and turn away from Compaq products to those of competitors.

Defendants observe that Plaintiffs have dropped their claim that the Direct Plus program was suspended by February 1999.

submitted some new, allegedly misleading statements expressing Compaq's optimism about its direct sales model and competitive prices, but no explanation as to why the statements were knowingly false. Defendants insist that Plaintiffs still fail to support their conclusory statements with any factual specificity and only add more conclusory accusations and speculation based on irrelevant, post-Class Period statements made in hindsight, none of which raises any inference of scienter. They provide no facts about the significance of either the Direct Plus or the configure-to-order sales initiatives, no facts about Compaq's expectations for these programs, no facts quantifying the results of these initiatives or facts demonstrating the effects of the results of these programs, and no facts that would connect the sales initiatives to Plaintiffs' theory of fraud, i.e., facts demonstrating by what specific information Defendants would have known in advance there would be a first quarter shortfall and would fraudulently misrepresent the problems and their significance.

As another specific example of Plaintiffs' lack of particularity in pleading, Defendants target Plaintiffs' reiterated assertion that the VARs "rebelled" against "Compaq's efforts to reduce sales incentives" in January and February by turning to "competitors' products, including IBM," thereby causing the direct sales initiative to fail. Complaint at par. 35. Plaintiffs present no factual background as to what Compaq's sales incentives were before the Class Period or details about how Compaq purportedly attempted to reduce them. While Plaintiffs claim that

Defendants "realized by the start of the Class Period" that Compaq's direct sales program was doomed because of the alleged "rebellion," they fail to identify even one VAR that opposed Compaq, no less "rebelled" against it, or a single sale lost because of the "rebellion." There are no details about the specific products involved, dates of transactions, names of customers, or amount of revenue affected. Nor are there any facts alleged regarding Compaq's competitors' success or failure to demonstrate that Compaq was at a competitive disadvantage. Defendants note that the accusation of the VARs' rebellion in January and February 1999 appears to have been lifted from a post-Class Period analyst report issued on April 12, 1999 by Bear Stearns, cited later in the complaint by Plaintiffs, which the analyst admitted was speculation, and which clearly is impermissible pleading of fraud by hindsight. Furthermore, Defendants explain that every quarter Compaq has arms' length negotiations with VARs during which Compaq tries to get the highest price for its products while offering the fewest incentives and the VARs seek the lowest price with the most incentives, all part of their normal business practice. Plaintiffs also hide behind a conclusory allegation that pursuant to a "corporate policy decision," by February 1999 Compaq gave in to the demands of the VARs to keep direct prices higher than necessary, again without pleading any factual details and support. Defendants point out that these allegations are contradicted by one of Plaintiffs' own documents, the February 1, 1999 Paine Webber Report, cited in the

new complaint at par. 35(d) (stating that Compaq's direct sales initiatives are running at $1 million a day and have "remained in line or better pricing than Direct channel leaders"). Defs.' Appendix, Ex. 2.

Although Plaintiffs assert that President and CEO Pfeiffer was "directly involved" in the VAR negotiations and that "at all relevant times, had knowledge of the Company's channel conflicts and its adverse impact on Compaq's first quarter 1999 sales," Defendants emphasize that Plaintiffs fail to identify a single VAR deal in which Pfeiffer participated or to explain the nature of his involvement. Plaintiffs do not identify a single document that Pfeiffer allegedly reviewed or point to any conversation with anybody that Pfeiffer had related to these deals. Nor do they explain how "channel conflicts" caused an "adverse impact" on first quarter sales.[6]

Once again, Defendants claim, Plaintiffs improperly cite vague, general, factually unsupported statements made four to seven months after the Class Period in SEC filings in August and November 1999 and February 2000, as well as the 1999 Fortune interview of Michael Capellas and a passage from the Company's Report on Form 10-Q for the third quarter of 1999, filed November 15, 1999, in

---

[6] Defendants emphasize that Pfeiffer's successor Michael Capellas' post-Class Period remarks that Compaq "got caught in a channel conflict" with its VARs and lacked the "additional capabilities" to go direct did not define "channel conflict," explain what it consisted of or how widespread it was. Such vague references cannot serve as a basis for a strong inference that anyone at Compaq committed fraud and do not provide facts demonstrating what Defendants knew, when they knew it, when the issues arose, or what significance they had in the Class Period.

impermissible hindsight pleading to attempt to create a strong inference of scienter with respect to Pfeiffer and Mason during the Class Period.

Defendants also object to reiterated, unchanged, factually unsupported allegations regarding insider trading[7] and speculative arguments that "Defendants must have known." Defendants highlight the fact that the Court previously focused upon pleadings that CEO Pfeiffer and Andreas Barth (Compaq's General Manager for Europe, the Middle East and Africa) allegedly made misrepresentations or false statements about Compaq's business status, but concededly never sold any stock or profited in any way from alleged insider trading, and therefore the Court concluded

---

[7] The Second Amended And Consolidated Complaint makes the following allegations:

> 12.  Defendant Earl L. Mason ("Mason"), until his abrupt resignation on Sunday, April 18, 1999, had been Senior Vice President and Chief Financial Officer of Compaq prior to and during the Class Period. During the Class Period, on February 1, 1999, Mason liquidated most of his Compaq holdings, selling 265,236 shares of Compaq common stock, at artificially inflated prices, and reaping insider proceeds of over $12.2 million, which shares were acquired by the exercise of options at greatly lower prices, allowing him to reap millions of dollars in profits. . . .
> 64.  From February 1 to February 24 (the day before Compaq's partial disclosure), defendant Mason and other non-defendant senior Compaq officers (and one director), without disclosing the slackening demand for Compaq's products and significant shortfall of earnings from what Compaq and the market were forecasting, sold over one million shares of Compaq common stock at prices as high as $47.625 per share, reaping insider proceeds of over $48 million.

that stock sales could not raise an inference of scienter as to them. Moreover, Defendants maintain that "it defies logic to think that key individuals such as Pfeiffer and Barth--necessary participants in any fraud scheme--would have risked their careers and the future of their company by committing fraud simply to allow other people to profit from it." #77 at 32.

Defendants remind the Court that they previously demonstrated that the stock sales that were made, including those by Mason, were not dramatically out of line with previous trading practices of the individuals who made them and thus also failed to create a strong inference of scienter. Moreover, in the new complaint Plaintiffs have now adopted Defendants' figures about the percentage of total holdings allegedly sold by Compaq executives during the Class Period after Defendants objected that Plaintiff's figures were overstated.[8] Furthermore Defendants insist Plaintiffs have alleged no new facts regarding insider sales and thus have failed to raise an inference of fraud based on them.

In addition, Defendants contend that Plaintiffs "repeat several arguments intended to substitute presumption and speculation for the facts required by the Reform Act," such as that Defendants had access to adverse, undisclosed information about Compaq by virtue of their high positions at the company. This Court has previously rejected such claims as of minimal if probative any value and conclusory. The same is true of

---

[8] In the first amended consolidated complaint Plaintiffs alleged that Mason had sold 94% of his Compaq common stock; Compaq insisted it was only 86%.

Plaintiffs' allegations that because Compaq's European and North American operations are essential to the Compaq, Defendants must have known or are charged with constructive knowledge regarding the performance of these operations. Defendants have previously shown that Plaintiffs are not permitted to broadly "charge" Defendants with knowledge, but must create a strong inference of scienter by the pleading of specific facts, not conclusory or speculative allegations.

Finally, Plaintiffs have again argued that the resignations of Compaq officers, in the days after Compaq disclosed earnings that were substantially inconsistent with the stellar reports given previously by Defendants, create an inference of scienter. This Court has indicated before that there are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by anything besides "a sense of inadequacy for the job in the face of Compaq's troubles." #66 at 126. Defendants maintain that Plaintiffs must plead facts connecting the resignations in some way with fraud or malfeasance.

In sum, Defendants insist that Plaintiffs have failed to plead "sufficient relevant facts . . . so as to support a strong inference of scienter with respect to each named Defendant," and therefore the new complaint should be dismissed.

### B. Kurtzman Plaintiffs' Opposition (Response and Reply)

Plaintiffs' response focuses on new allegations in their Second Consolidated and Amended Complaint, which they maintain "bolster the allegations of the Original Complaint considerably and in line with the Court's mandate" to plead specific facts giving rise to a strong inference that each Defendant acted with the required state of mind. They claim to rely heavily on this Court's opinion in In re Landry's Seafood Restaurant, Inc. Sec. Litig., Civil Action No. H-99-1948, sl. op. (S.D. Tex. Feb. 20, 2001), in arguing that they have met the pleading requirements under the PSLRA.

For instance, Plaintiffs have identified an internal company document, the "Plan of Record," which was created by Defendants Pfeiffer and Mason and other Compaq senior executives and which allegedly showed as early as August 1998 that 1999 sales of Compaq PCs were expected to decline across the board. Complaint at par. 31. Plaintiffs allege that to track actual results and compare them to the forecasts in the Plan of Record, Compaq's finance department prepared reports daily and weekly detailing actual sales for each major geographic region. The reports were prepared by Compaq employees using a "Weekly Explorer" SAP application program, collected by Compaq's finance division from each of Compaq's major geographic regions, and distributed to senior officers, including Pfeiffer and Mason. Plaintiffs allege that before and throughout the Class Period these reports, which showed exactly how many orders were actually generated on a daily and weekly basis, reflected weakening demand and decline in sales

for Compaq's products, thus demonstrating the accuracy of the Plan of Record's forecast.  Id. pars. 32-33, 36, 40, 46, 52, 60. Specifically the reports showed that DEC's sales were declining by 30-40% during the first quarter of 1999 and that DEC customers were turning to competing manufacturers that offered Unix-based computers.  Id. at par. 40.  The reports also revealed weakening demand for and sales of Compaq's products in North America and Europe.  Id. at par. 52.  Thus the executives, including Pfeiffer and Mason, were aware of this information and continually and closely monitored Compaq's business, yet Defendants made very positive statements regarding the projected and actual demand for and sales of Compaq's products in the first quarter of 1999 when they knew or recklessly disregarded the actual weaker demand and declining sales embodied within these documents.  Id. par. 36.

Plaintiffs have also pled that every month five internal meetings, one for each of the major geographical areas, were held at Compaq's Houston headquarters during the Class Period to address the weakening demand for and declining sales of Compaq products in each region.  Id. at par. 34.  Among the attenders were vice presidents who reported directly to Mason.  The daily and weekly actual sales reports were reviewed, as well as daily and weekly reports regarding inventory backlogs, increasing returns of PCs not sold by Compaq resellers, and increasing inventories of service spares (replacement parts kept on hand for repairs and replacements of unsold PCs), all reflecting a decline in demand and sales throughout the Class Period.

Thus Plaintiffs have pled the "who, what, when, where and how" regarding the Plan of Record, the daily and weekly reports, and the monthly five internal meetings focusing on each of the geographical regions.

Furthermore, the Plaintiffs urge that the issues of weakening demand and declining sales were so important to Compaq that it set up these five monthly meetings to discuss the status in each major geographic region. Courts have continuously held that knowledge of core business matters can be inferred to the officers and directors of a company. Epstein v. Itron, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998)("facts critical to a business' core operations or an important transaction generally are so apparent that the their knowledge may be attributed to the company and key officers"); In re PeopleSoft, Inc. Sec. Litig., No. C 99-00472, 2000 WL 1737936, *3 (N.D. Cal. May 25, 2000)(same); Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)(same), cert. denied, 531 U.S. 1012 (2000); In re Southern Pac. Funding Corp. Sec. Litig., 83 F. Supp.2d 1172, 1177 (D. Or. 1999)(same); In re Ancor Communs. Inc. Sec. Litig., 22 F. Supp.2d 999, 1005 (D. Minn. 1998)(same). Extending this principle to the DEC sales, Plaintiffs urge that Compaq's decision to instruct DEC's sales force to concentrate on selling Compaq's lower margin NT-base products, as opposed to DEC's higher margin Unix-based products, and to stop advertising and promoting the latter was so critical to Compaq's operations and the integration of DEC after the merger that Defendants had to either

have participated in the decision or had to have known of its implementation.

Adding to the import of these allegations regarding reports and meetings, the new complaint further states that on February 25, 1999, in a private meeting with First Boston analyst Michael Kwatinetz, Pfeiffer and Mason revealed that Compaq's actual sales for the first six weeks had slowed and were below plan. #72 at par. 63. In re Cell Pathways, Inc., No. 99-725, 2000 WL 805221, *7 (E.D. Pa. June 20, 2000)(allegations of comments in interview with representative of Bloomberg Forum overcome prohibition against stating that Defendants' scienter is established merely by their positions in the company). Furthermore, at a February 16, 1999 International Press Briefing, Pfeiffer made direct comments indicating that top management paid close attention to tracking the performance of competitors like Dell. #72 at par. 59; Defendants' Appendix, Ex. 14, at 2. Pfeiffer further stated, "Channel inventory is an important indicator that we look at very closely, in particular in 1998, and we began to pay top level attention to the weak channel inventory." Id.

Plaintiffs argue that when all their other allegations are read together, they as a group suffice to create a strong inference of scienter.

Because as indicated in its memorandum and order (#66), the Court agrees with Defendants that statements by Pfeiffer's successor or SEC filings made months after the close of the Class Period through the lenses of hindsight to plead fraud may not be

used to demonstrate Defendants' state of mind at the time they made their alleged misrepresentations or false statements, the Court does not summarize or consider at all Plaintiffs' discussion of them.[9]

Among Plaintiffs' other allegations is the circumstantial evidence of Defendants' positions[10] in the company to raise an inference of scienter, an argument which, if it stands alone, this Court and the Fifth Circuit generally reject. Nathenson, 267 F.3d at 424 ("normally an officer's position in a company does not suffice to create an inference of scienter"). As a second factor, Plaintiffs argue that the temporal proximity of Defendants' allegedly false statements, all within a three-month period before to the revelation of Compaq's actual poor earnings on April 9, 1999, indeed the last statement made on March 12, 1999 only twenty-

---

[9] Included in this group of statements made by Michael Capellas on August 16, 1999 regarding difficulties with the integration of DEC and Compaq and with the direct sales initiative program and the channel conflict with the VARs. Regardless whether Plaintiffs' allegations go to the magnitude of the difference between Class Period statements and post-Class Period Statements or to the temporal proximity, such post-Class Period statements still constitute pleading fraud by hindsight and fail to demonstrate scienter. See, e.g., City of Philadelphia v. Fleming Companies, Inc., 264 F.3d 1243, 1260 (10th Cir. 2001); Stevelman v. Alias Research, Inc., 174 F.3d 79, 84-85 (2d Cir. 1999)("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud"); Suna v. Bailey Corp., 107 F.3d 64, 68-69, 71 (1st Cir. 1997)(securities fraud plaintiffs must demonstrate (1) statements were false or misleading at the time they were made; and (2) "that it is reasonable to believe that the defendants knew [the statements] were false and mislead"; "misguided optimism is not a cause of action, and does not support an inference of fraud").

[10] As noted, Pfeiffer was President and CEO, and Mason was Senior Vice President and CFO of Compaq.

six days before Compaq's earnings disclosure, supports a strong inference of scienter. The Court notes that proximity, by itself, is also weak evidence of fraud at best, since such a circumstance would generally be the case in suits alleging securities fraud and might well support the opposite proposition. <u>Kreindler v. Chemical Waste Management, Inc.</u>, 877 F. Supp. 1140, 1154 (N.D. Ill. 1995)("Timing, alone, cannot support an inference of fraud."). Such a broad, unsupported generalization that proximity of a false statement to a public disclosure evidences <u>scienter</u> leaves unexamined the myriad of specific facts and circumstances that might have resulted in an unexpected public disclosure. As a third factor, Plaintiffs have also pointed to the resignation of nearly all Compaq's senior executives, including Pfeiffer and Mason, within a few days of the disclosures of adverse earnings gives rise to an inference that Defendants acted with scienter. This factor, too, does not, without allegation of facts that would link the resignations with purported fraud, carry great weight, since there could be so many unrelated reasons for their leaving.

Finally, Plaintiffs again allege insider trading, but this time with particularity only against Mason. Mason, according to the new complaint, sold a highly unusual amount of stock on February 1, 1999. In the five quarters before that date he sold a total of only 158,000 shares; on February 1, 1999, he sold 67% more shares, i.e., 265,236 shares, representing 86% of his holdings, for $12.2 million, twice the total amount of proceeds

that he had reaped in the previous five quarters together.  #72 at par. 87.

### C.   Court's Ruling

As a threshold matter needing clarification, Plaintiffs have represented that "t]his Court has already found that most of Defendants' statements, as alleged in the Original Complaint, were false and misleading."  The Court did not conclude that Defendants' statements were false and misleading, but merely found that to adequately state a claim and avoid dismissal under the PSLRA and Rule 9(b), Plaintiffs had, but failed, to allege particularized facts creating a strong inference that the statements were made with the requisite scienter.  Even under Rule 12(b)(6) this Court is required to view as true and in a light most favorable to Plaintiff only "well-pleaded facts."  Campbell v. City of San Antonio, 43 F.3d 973, 975 (5th Cir. 1995), citing Heaney v. United States Veterans Admin., 756 F.2d 1215, 1217 (5th Cir. 1985).  To be well pled, "'the complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.'"  Id. at 975, quoting 3 Wright & Miller, Federal Practice And Procedure:  Civil 2d § 1216 at 156-59.  "'[A] statement of facts that merely creates a suspicion that the pleader might have a right of action" is insufficient.  Dismissal is proper if the complaint lacks an allegation regarding a required element

necessary to obtain relief. . . .[citations omitted].'" Id.,
quoting 2A Moore's Federal Practice par. 12.07 [2.-5] at 12-91.
Moreover, "'conclusory allegations or legal conclusions
masquerading as factual conclusions will not suffice to prevent a
motion to dismiss.'" id., quoting Fernandez-Montes v. Allied
Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993). The Court, in
ordering Plaintiffs to replead, obviously found that their pleading
was inadequate to state a section 10(b) claim and avoid dismissal
under the PSLRA. The Court has not reached any conclusions here
about the truth or falsity of the alleged misrepresentations, false
statement, and material admissions.

As noted, the Fifth Circuit in Nathenson endorsed the
requirement that Plaintiffs must plead particularized facts giving
rise to a strong inference of scienter and that while allegations
of motive and opportunity may add to the strength of the inference,
they do not automatically nor usually suffice to satisfy that
standard. 267 F.3d at 412. The more complex problem is
determining how specific the alleged facts must be to give rise to
the strong inference of scienter. The Fifth Circuit has commented,

> The probative force of facts alleged
> ultimately depends on reason and experience,
> and in this respect guidance can properly be
> afforded by prior judicial decisions.
> However, resolving the question of the degree
> of probative value to be required also
> involves normative considerations. . . . "This
> difficulty in application stems, at least in
> part, from the 'inevitable tension' between
> the interests in deterring securities fraud
> and deterring strike suits. . . . As a result,
> different courts applying the standard to
> differing factual circumstances may reach
> seemingly disparate results."

Id. at 412, quoting Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999).

Defendants appear to contend that Plaintiffs must allege every detail regarding the Plan of Record and the weekly reports to raise a strong inference of scienter. The Ninth Circuit, which in contrast to the Fifth Circuit, has held that the PSLRA substantively as well as procedurally enhanced the scienter requirement to "deliberate reckless," See, e.g., In re Silicon Graphics, Inc., 183 F.3d 970, 984 (9th Cir. 1999)(The PSLRA requires a plaintiff to "state with particularity all facts forming the basis for his belief" and to "provide a list of all relevant circumstances in great detail."). In contrast, the Fifth Circuit stated in Nathenson, 267 F.3d at 408-09, "It seems clear to us that the PSLRA has not generally altered the substantive requirement for claims brought under section 10(b) and Rule 10b-5," and recognized that the First, Third, Sixth and Eleventh Circuit are in accord. This Court indicated in its memorandum and order, #66 at 121, that at this stage, when there has been no discovery, it "finds the Ninth Circuit's requirement of nearly complete details regarding every material aspect of the litigation to be excessive, harsh and unfair." Nevertheless, it does require sufficient specificity with respect to at least a reasonable number of the reports on which Plaintiffs claim to rely to raise a strong inference of scienter; general statements without particular factual support are insufficient.

The Court has reviewed the record in the context of the entire scenario alleged here, weighing the various allegations separately and together. One striking features of this suit is the brevity of the Class Period, i.e., January 9, 1999 through April 9, 1999. In the personal computer industry in the past few years there have been substantial and extreme fluctuations in demand and sales. Plaintiffs have made no attempt to compare Compaq's situation with that of the industry as a whole at this time. Especially in light of the brevity of the Class Period designated here, moreover the Court find that it essential for Plaintiffs to allege particular facts and to provide specific time points of comparison that would demonstrate that the business problems experienced by Compaq from January 9-April 9, 1999 were not merely a short-term fluctuation but of considerable import and that Defendants were aware that the declines in demand and in sales in January 1999 were significant and material, i.e., that they indicated or determined the entire year's results. Plaintiffs need to provide factually and numerically specific information about the alleged decline in the Class Period and contrast it with conditions in parallel or equivalent quarters of past years or with past years as a whole, to establish by an objective means of measurement the significance as well as the particulars of the generally asserted downturn. The Court finds that they have completely failed to do so. Thus they fail to show that the claimed decline was significant in its impact in the short as well as in the long view.

After reviewing the new complaint, the Court finds that Plaintiffs also fail to allege any direct link between Pfeiffer and Mason and the regular, but vaguely and conclusorily described Plan of Record, daily and weekly reports (reflecting conclusorily designated "weakening demand," "declining sales," "inventory backlogs," product returns, and "increasing inventories of service spares"), and monthly five internal meetings focusing on each geographical region. There is no allegation that they personally read any particular report or attended even one of the meetings, or facts that would show someone reported these matters to them. This deficiency makes stronger, more specific allegations elsewhere in the complaint more essential.

Furthermore, Plaintiffs fail to allege with any specificity the actual contents of these claimed sources of information (Plan of Record, reports, meetings), including numerical specifics to demonstrate that if the reports had been communicated to Defendants, they would have alerted Defendants to significant downturns in Compaq's business. Instead Plaintiffs fail to describe the actual substance of a single one of the reports or of any single discussion at any monthly meeting on which Plaintiffs rely to give rise to a strong inference of scienter. Nor do Defendants here concede that they read the Plan of Record and the daily, weekly and monthly reports, in contrast to the defendants in <u>Landry</u>, who expressly admitted in their SEC filings that they "monitored the business continuously and closely on a

daily basis from internal spreadsheets and reports from each Landry restaurant." In re Landry, sl. op. at 64.

Nor do Plaintiffs conclusorily or in detail allege any reaction by any officer of Compaq indicating any concern with or plan for altering business projections on a quarterly or yearly level or developing business stratagems to counteract the purportedly perceived downward trajectory. Indeed the lack of any such observed reaction anywhere in this large company, despite Plaintiffs' contention that Defendants knew and recklessly disregarded signs of imminent deterioration, works against raising any inference of scienter.

Plaintiffs maintain that, if not separately, all these factors combined would give rise to a strong inference of scienter. Plaintiffs' additionally weak factual allegations, including knowledge based on the officers' positions in the company, the assertion that as officers they must have had knowledge core business activities, the reliance on the temporal proximity of the alleged false statements to the disclosure of a severe drop in earnings in April 1999, and the sudden resignations after the April 9th disclosures, under the circumstances of this action are not sufficiently persuasive, individually nor in concert, to give rise to a strong inference of scienter.

With respect to the proximity argument, Defendants earlier pointed out, and the Court's review of the alleged misrepresentations in the Second Amended And Consolidated Complaint confirms, that most of the challenged statements relate to Compaq's

success in 1998 and its business expectation for the entire year of 1999 and even beyond, and not to the first quarter of 1999. Indeed none of the statements is expressly or clearly limited to that first quarter; many are very general comments. Moreover, no facts have been alleged nor authority has been cited for the proposition that the first quarter of 1999's sales would necessarily doom the entire year's projections.

Other than the short time between the earnings disclosure on April 9th and the resignations on the 18th, a weak link at best, Plaintiffs have failed to allege any facts that would connect Pfeiffer's and Mason's resignations with the alleged fraud.

As for insider trading, these allegations lose force in the wider context. In Landry, on which Plaintiffs claim to rely, there was significant insider training by alleged various officers of the company, including the CEO. Here, Mason is the only one of the original individual Defendants that Plaintiffs' new pleading asserts has specifically alleged sold a suspicious amount of stock.

The fact that the new pleading alleges particular insider trading information only about Mason diminishes any inference of fraud. Pfeiffer, who owned 10,015,893 shares, sold none. #65, ex. 12. There is no explanation why Pfeiffer, who no one disputes controlled the company and would have to have known of any scheme to defraud Compaq's investors, especially if he was one of the two officers allegedly making material misrepresentations about its business situation, would not logically have cashed in his stock if

he was involved in securities fraud.   Similarly Barth,[11] to whom

misrepresentations are also attributed even though he is no longer

a named Defendant, owned 2,634,129 shares and did not trade any of

them.   #65, Ex. 12.   As Defendants comment,

> Plaintiffs do not claim that Mason committed
> fraud alone, they claim that he did so in
> conjunction with Chief Executive Officer
> Eckhard Pfeiffer, with the head of European
> and African operations Andreas Barth, and with
> the other Compaq officers.  But none of these
> officers is alleged to have engaged in unusual
> insider sales during the Class Period, and the
> two most important officers--the ones who made
> most of the alleged misrepresentations--are
> not alleged to have traded at all. . . .
> Plaintiffs have not offered a single reason
> why either of these two officers would have
> chosen to risk their careers and place the
> Company's future in jeopardy by taking part in
> a fraudulent scheme from which they did not
> profit.

#88 at 14-15.   Plaintiffs have not alleged any inconsistencies

between Mason's alleged misrepresentations and those of the other

two officers nor any facts that would suggest Mason controlled or

duped Pfeiffer and Barth into knowingly or with conscious disregard

making fraudulent misrepresentations about Compaq's business

health.   In light of Pfeiffer and Barth's powerful positions at

Compaq and their complete lack of trading at this time, in the

absence of any persuasive allegation of motivation for their

alleged fraud, Mason's trading is not sufficiently probative to

raise a strong inference of scienter.   See, e.g., In re Zapata,

Inc. Sec. Litig., Civ. Action No. H-98-3498, sl. op. at 39 (S.D.

_____

[11] Barth was Compaq's senior Vice President and General Manager
for Europe, the Middle East and Africa.   According to the
complaint, Europe accounted for 40% of Compaq's total revenues.

Tex. Sept. 15, 1999)(Lake, J.)("Plaintiffs do not allege that [the company] and/or [its CEO] sold stock or profited in any way from the alleged fraud.  Plaintiffs' allegations that [the CEO] would knowingly chose to participate in fraud merely to allow two of the [company's] former officers to profit from the sale of stock is not plausible"); San Leandro, 75 F.3d at 813 (rejecting argument that insider sales of one defendant, where other key defendants did not trade, raised a strong inference of scienter); In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1423 (in absence of stock sale by CEO, insider trading allegations as to other officers were insufficient to create a strong inference of scienter).

Furthermore, Defendants have previously demonstrated with information from SEC Forms 3 and 4 that with regard to Mason's only two previous sales of Compaq stock, in July 1997 he sold 158,416 shares, or 91.62 % of his holdings and in July 1998, he sold 158,000 shares or 53.73% of his holdings.  #65, Ex. 2.  The 1999 sale of 86.07% of his holdings was not "dramatically out of line" with his earlier trading practices.  Id.  Furthermore, all three trades occurred on the first day of the trading window.  Moreover, Defendants have also shown that Plaintiffs have failed to take into account the large number of options (4000 shares) that Mason exercised and purchased, but did not sell during the Class Period.

Furthermore the amended complaint identifies the following optimistic statements made by Pfeiffer and Mason about the integration of Compaq and DEC:

> (1) Pfeiffer's statement on January 7, 1999 on
> CNBC:    "The  organizations  are  completely

integrated and merged and we expect to see the synergies that we've been expecting from the merger not only happening already during the last part of last year, but coming into full bloom in 1999."

(2) Pfeiffer's statement in a January 27, 1999 press release: "The fourth quarter revenue and earnings results represent . . . a key milestone in our successful integration of Digital Equipment Corporation."

(3) Mason's statement, presumably at the same time: "The synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong, and we continue to gain momentum in our service businesses."

(4) Mason's subsequent statement during an interview on CNBC's "Squawk Box" program: "Well our gross margins continue to go up. . . . Some of the reason[s] why they're going up is further integration of [DEC] companies and of course we've made good progress on that . . . . ."

"Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements[12] or are

---

[12] A "forward-looking statement," which can be either written or oral, is defined under 15 U.S.C. § 77z-2(h)(1) inter alia as a

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items'
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules

generalized statements of optimism that are not capable of objective verification. Vague optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." Grossman, 120 F.3d at 1119-20 (and cases cited therein). "[M]isguided optimism is not a cause of action and does not support an inference of fraud." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994). "[Investors] rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993).

In the context of merger and acquisition, courts have consistently found general optimistic statements to be such corporate puffery. For instance, in Grossman, the appellate court affirmed the district court's conclusion that as a matter of law the following statements by the CEO were immaterial statements of corporate optimism and that they were dealt with in much more detail in the cautionary sections of the registration statements and amendments thereto: that the company had experienced "substantial success" in integrating the sales forces of the two companies, that the merger was moving "faster than we thought," that the merger presented a "compelling set of opportunities" for the company, and that "[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge of the expanding scope of network solutions." Grossman, 120 F.3d at 1121-22.

_____

and regulations of the Commission . . . .

Citing Grossman, the United States District Court for the Northern District of California observed, "Merging companies always predict they will integrate their sales forces and management teams," and that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are too familiar to market observers." Kane v. Madge Networks, N.V., No. C-96-20652-RMW, 2000 WL 33208116, *3 (N.D. Cal. May 26, 2000). In Kane, the court concluded that the following, acquisition-related statements inter alia were "equally immaterial" "rosy affirmation[s]" and granted the defendants' motion to dismiss with prejudice under Fed. R. Civ. P. 12(b)(6): "the quarter was also characterized by the significant progress we made in combining the two companies"; Madge and Lannet were "working together"; R. Madge personally believed that the Lannet acquisition was "fabulous"; "merger-related risks are not as significant as one might assume"), Id. at *2-3. Observing that "[i]n a fraud on the market case such as this, the sophisticated players who help set market prices are expected to be appropriately skeptical of a company's efforts at self promotion," id. at *3, the Kane court quoted from Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1217 (1st Cir. 1996):

> [C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

- 53 -

Id. at *3.  Furthermore, the Kane court made clear,

> When one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light.  Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve "synergies" from the combination.  Reasonable investors know better than to rely on these statements, which are all too familiar to market observers.

Id. at *3.

In In re Razorfish, Inc. Sec. Litig., No. 00 CIV. 9494 (JSR), 2001 WL 1111502, *1-2 (S.D.N.Y. Sept. 21, 2001), after Razorfish,Inc. acquired International Integrated, Inc., a consulting company known as "i-Cube," plaintiffs in a securities fraud suit challenged as false the following twelve statements because they claimed that the integration was "neither successful nor complete":  "[Razorfish's] major integration efforts [were] complete";  "[T]he [C]ompany successfully converged service offerings and pricing, completing the i-Cube integration"; "Razorfish finished 1999 on a remarkably strong note, once again demonstrating that we are successful execution our growth strategy . . . ."; "Razorfish believes that [its programs to maintain a productive, energetic employee workplace] have enabled it to quickly integrate its employees from its numerous acquisitions and to attract top professionals"; "Our strong sequential quarter-over-quarter growth of 22% has Razorfish hitting on all cylinders now that we have successfully integrated our acquisitions and built global, saleable capabilities that will harness the wireless and broadband explosion and keep Razorfish at the forefront of the

- 54 -

digital revolution"; "[Pehl's] appointment as President reflects not only the stupendous job he did integrating i-Cube into the Razorfish organization but also his superb strategic and technology skills in accessing opportunities for Razorfish's continued growth and success"; "I [Pehl] could not be more pleased with our accomplishments to date, in particular the successful integration of i-Cube into Razorfish . . . ."; "I [Pehl] depart knowing that the i-Cube integration is complete . . . ."; "Since joining Razorfish, [Pehl] has done an outstanding job in helping us accomplish the success we have achieved. . . . in building the depth of our strong management team"; the "positive" research report published by SG Cowan on September 5, 2000; and research report issued by Credit Suisse First Boston on September 13, 2000. The district court, citing Grossman and In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp.2d 211 229 (D. Mass. 1999), observed that "'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud." Because the general statements were not contradicted by any particularized allegations in the complaint, the court dismissed the whole complaint with prejudice. See also Fitzer v. Security Dynamics Technologies, Inc., 119 F. Supp.2d 12, 30 (D. Mass. 2000)(affirmative statements on website that "the integration 'accelerated' Security Dynamics' efforts and abilities and that the result would be a 'preferred' product and would 'position [Securities Dynamics] to be the first to offer such a solution" are corporate puffery that cannot be said to have misled investors); In

- 55 -

re Peritus Software Services, 52 F. Supp.2d at 226, 229 (holding non-actionable company's optimistic statements about success of merger, including "the acquisition and integration of [Millennium] has been a success," "this confirms our belief that clients can easily leverage the combined product suites," and "[we have] completed the . . . acquisition," when there were numerous problems because the two companies' products did not fit well together and there was friction among the sales force); In re S1 Corp. Sec. Litig., 173 F. Supp.2d 1334, 1355 & n.17 (N.D. Ga. 2001)(finding the following statements to be immaterial corporate puffing and optimism: the company's merger with other entities "a deal that could make the company the dominant force in software"; the company was creating the "world's most complete financial portal solutions provider"; the merger "will enable FICS to join forces with Security First Technologies and Edify to become the leading provider of Internet-based financial services applications in the world"; "we are confident that the new deal [merger] places the new S1 Corporation in a stronger position for executing its long-term global strategy").

In light of the opportunity given to Plaintiffs to amend and to attempt to assert well-pled factual allegations, the Court has reconsidered and finds, under all the circumstances including those alleged in the the new pleadings and the evidence previously submitted into the record, that these vague statements of Pfeiffer and Mason about the integration of Compaq and DEC are not what a reasonable investor would consider to be significant, do not alter

the total mix of information available about investment in Compaq stock, are mere corporate puffery, and as a matter of law, immaterial, and constitute no basis for reasonable reliance by investors. The statements therefore do not give rise to a strong inference of fraud.

For all these reasons, the Court finds that Plaintiffs have failed to plead facts with sufficient particularity under the particular circumstances of this case to raise a strong inference of scienter. Accordingly, the Court grants Defendants' motion to dismiss the Kurtzman Complaint for failure to state a claim under Rules 12(b)(6) and 9 and the PSLRA.

### TURNER'S SECOND AMENDED CLASS ACTION COMPLAINT

The Court's memorandum and order found that Turner's claim[13] under Section 11 of the Securities Act of 1933[14] was

_____

[13] Turner represents that his proposed class consists of all persons or entities that purchased Compaq common stock between January 21, 1999 and April 9, 1999 pursuant to two S-8 Registration Statements filed with the SEC on September 30, 1998 and March 17, 1999 (Exhibits 2 and 5 to Defendants Appendix, #57), issued in connection with the offering of Compaq common stock to Compaq's employees, and that were allegedly damaged thereby.

Defendants disagree that the March 17, 1999 Registration Statement was issued in connection with the stock offering to Compaq employees for purchase of Compaq common stock. Instead, they point out that the document states on its face that it was filed to register shares of Compaq stock to cover stock options earned by former employees of Shopping.com, a company purchased by Compaq in early 1999. Defs.' Appendix, #57, Ex. 5 at 3.

[14] Section 11 of the Securities Act allows a private cause of action where a registration statement either "contained an untrue statement of a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. A claimant may sue _inter alia_ every person who signed the registration statement or who was a director of the

was grounded in fraud rather than negligence and therefore had to satisfy Rule 9(b) pleading-with-particularity requirements. Melder v. Morris, 27 F.3d 1097, 1100 & n.6 (5th Cir. 1994)("When 1933 Securities Act claims are grounded in fraud rather than negligence . . . Rule 9(b) applies").[15]   See also In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1404-05 (9th Cir. 1996)("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when . . . they are grounded in fraud"), cert. denied sub nom. Anderson v. Clow, 520 U.S. 1103 (1997); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 287-89 (3d Cir.)(affirming district court's ruling that 9(b) applies to Section 11 claims sounding in fraud), cert. denied, 506 U.S. 934 (1992); Sears v. Likens, 912 F.2d 889, 892-93 (7th Cir. 1990).[16]

The Court further found that the four statements by

_____

signed the registration statement or who was a director of the issuer at the time that registration statement was filed.   Id. Pfeiffer and Mason both signed the 1998 Form 10-K filed with the SEC on February 24, 1999, and Pfeiffer signed both Registration Statements at issue in this action.

[15] In Melder, the plaintiffs alleged inter alia violations of §§ 11, 12(2), and 15 of the Securities Act of 1933, as well as of § 10(b) of the Securities Exchange Act of 1934.   The Fifth Circuit applied Rule 9(b) because the plaintiffs' 1933 Act claim was a "wholesale adoption of the allegations under the securities fraud claims" and thus were grounded in fraud, not negligence.   Id. at 1100 n.6.
      In the instant case, the Court found that Turner's claims arise out of and are based on the same alleged facts as the Kurtzman claims.

[16] But see In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 314 (8th Cir. 1997)("[T]he particularity requirement of Rule 9(b) does not apply to claims under Section 11 of the Securities Act . . . .").

Defendants that Turner challenged were "forward-looking statements."[17]

Apparently in reaction to the Court's application of Melder, Plaintiff's second amended complaint asserts unambiguously that his claims "are not based on fraudulent or intentional conduct and plaintiff expressly disavows and disclaims any allegations of fraud herein." #73 at p.2, par. 2. He relies on Lone Star Ladies Investment Club v. Schlotzky's, Inc., 238 F.3d 363 (5th Cir. 2001)(where a complaint does not allege that defendants are liable for fraudulent or intentional conduct and disclaims any allegations of fraud in its strict liability 1933 Securities Act claims, its claims do not sound in fraud and cannot be dismissed under Rule 9(b)).

The four allegedly false and misleading statements in the Registration Statements identified in Plaintiffs' earlier pleading were as follows:

> 1. Mason's statement in Compaq's January 27, 1999 press release,[18] Defs.' App., Ex. 1: "The

---

[17] Where a statement is "mixed," i.e., contains both historical comments as well as future predictions based on those observations, the whole statement is viewed as forward-looking for purposes of the PSLRA's safe harbor provision. Harris v. Ivax Corp., 182 F.3d 799, 806-07 (11th Cir. 2000).

[18] The September 30, 1998 Registration Statement is found in Defendants' Appendix (#57), Ex. 2; the March 17, 1999 Registration is Ex. 5 to the same Appendix. As the Court noted in #66, the September 30, 1998 Registration Statement ("September Registration Statement"), pursuant to SEC rules, including Item 3 of Form S-8, incorporated by reference all documents subsequently filed by Compaq with the SEC. In addition, Item 9 of Form S-8 required Defendants to provide inter alia the information required by Item 512(a) of Regulation S-K, which requires the company "[t]o reflect in any prospectus any facts or events arising after the effective

> synergies from the Digital acquisition are becoming more and more evident in our financial performance. Sequential revenue growth in products was exceptionally strong and we continue to gain momentum in our service business." First Amended Complaint ¶ 19; Second Amended Consolidated Complaint at par. 22.

Turner alleges that the press release statement was materially false or misleading when it was issued because it misrepresented or omitted material adverse facts then in existence when Defendants were claiming beneficial synergies from Compaq's acquisition of DEC in improving its financial performance, revenue growth, and increased service business. In particular, Plaintiff claims this statement omitted the following material adverse facts existing at the time, previously discussed with respect to the Kurtzman complaint: (1) notification to DEC's sales force about change in compensation as of January 1, 1998, with resulting "synergies" reported for December 1998 being nothing more than "low hanging fruit" picked by DEC's sales force, to be followed by a January 1999 below expectations; and (2) instructions to the DEC sales force to focus on selling Compaq's N-T based products, as opposed to DEC's higher margin Unix-based computers, and to stop advertising and promoting the latter. Second Amended Class Action Complaint at 8-9, par. 23(a) and (b).

_____

date of the registration statement . . . which individually or in aggregate, represent a fundamental change in the information set forth in the registration statement."

The January 27, 1999 press release was attached as exhibit 99 to the Form 8-K filed by Compaq with the SEC on January 27, 1999. It was thus incorporated by reference under SEC rules, including Item 3 of Form S-8, into the September Registration Statement.

> 2.    Pfeiffer's statement, quoted in the same press release: "We continue to see strong demand for Compaq products and services and the opportunity for continued market share gain and revenue growth."    First Amended Complaint ¶ 21; Second Amended Consolidated Complaint at par. 24.

Plaintiff alleges this statement was false and misleading at the time for same conclusory reasons as presented in the Kurtzman complaint:    (1) because of weakening demand from corporate customers mainly in North America and Europe, an area that usually accounted for 40% of Compaq's sales; (2) failure of Compaq's multi-channel distribution system of direct and indirect sales; (3) loss of sales to competitors like Dell and failure of Compaq's CTO plan due to Compaq's inability to maintain a chain of suppliers for its PCs, including Western Digital, which supplied hard disk drives; and (4) price protections and concessions paid by Compaq to VARs. Second Amended Consolidated Complaint at par. 25 (a-d).

> 3.    A statement in Compaq's 1998 Report on Form 10-K: "Compaq expects the personal computer market to expand in 1999 in line with third-party research organization's forecasts of unit growth of 15%."    First Amended Complaint ¶ 23.

This statement was deleted from Second Amended Consolidated Complaint and therefore any claim based on it is moot.[19]

---

[19] Commenting that "Plaintiff has understandably elected not to continue to base his claim on this statement," Defendants emphasize that they pointed out in their original motion to dismiss (#55 at p. 53, n.50) that this prediction "turned out to be completely accurate, even conservative, by the time the earlier complaint was filed." #80 at p. 5.    They further note that the statement "does not comment on Compaq specifically or, for that matter, the first quarter of 1999." Id.

4. A statement in the 1998 Report on Form 10-K[20]: "Compaq believes that the Digital acquisition will enhance its operating results." First Amended Complaint ¶ 25; Second Amended Consolidated Complaint at par. 28.

Plaintiff contends that this statement is false and misleading because it did not disclose that Compaq had implemented policies calculated to reduce, rather than expand, DEC's sales in 1999, as discussed previously.

In addition to reasserting statements 1, 2 and 4, Turner's Second Amended Class Action Complaint adds two new statements:

A. A statement in Form 10-Q [(incorporated by reference into the September Registration Statement)], filed with the SEC on or about November 13, 1998:
Competitive Environment. Competition remains fierce in the information technology industry with a large number of competitors vying for market share. Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. A number of personal computer companies sell directly to end users and, particularly in the U.S., direct sales have increased as a percentage of the total personal computer market. Compaq has established a variety of programs designed to increase its manufacturing, distribution, and business process efficiencies to enable it to compete more effectively in its PC business. Compaq sells directly to end users in its high-end business and its service business. The success of its programs to increase its business efficiencies depends upon Compaq's ability to continue its successful working relationship with its resellers, to maintain

---

[20] Compaq filed the report with the SEC on February 24, 1999, and thus it was incorporated by reference into the September Registration Statement by terms of that Registration Statement's Form S-8.

and increase its service business, to both predict and react quickly to market responses by its competitors and to continue the implementation of its Optimized Distribution Model, the goal of which is to implement more efficient supply, manufacturing, and distribution strategies to increase overall efficiencies. [Emphasis added.] Second Amended Consolidated Complaint (#73) at p.7, par. 20.

Plaintiff asserts that this statement was false and misleading *inter alia* because Compaq "was continuing to lose a substantial amount of sales to direct channel competitors such as Dell; and . . . the hybrid sales model used by the Company was creating a 'channel conflict. . . .'" Second Amended Class Action Complaint at p. 8, Par. 21.

B. In Paragraph 26, p. 13 of the new complaint, quoting from a 1998 Form 10-K[21] filed with the SEC on or about February 24, 1999, regarding Compaq's transition to a Configure-To-Order ("CTO") model: "The year 1998 was transitional for Compaq. During the first half of the year, the Company accelerated the implementation of the optimized distribution model towards the goal of moving from a build to stock operating model to a build-to-order/configure-to-order model." In fact, the Company fully asserted that it had experienced in 1998 a "short term reduction in revenues relating to the impact of significant pricing and promotional actions taken in conjunction with the Company's transition to the optimized distribution model . . ." and that "[t]he decrease in gross margin in 1998 resulted largely from significant pricing and promotional actions taken by Compaq primarily in the North American market during the first and second quarters of 1998 to meet the goals of the Company's optimized model . . . [.]" [Emphasis added in complaint.] Second Amended Consolidated Complaint at par. 26.

---

[21] Pfeiffer and Mason signed this document.

Plaintiff charges that these selected statements in the 1998 Form 10-K were materially false and misleading because Compaq's goals of transition to an optimized direct distribution model had not been successful.  Turner states that Compaq admitted the next year in its 1999 Form 10-K that Compaq failed to keep pace with changes in the industry and still had not moved to a direct sales model.

Henceforth, when discussing the statements individually, the Court will refer to them by number (1-4) or letter (A or B).

To place the claims in a legal framework, the Court sets out the applicable law.  As the Court noted earlier, a "forward-looking statement," which can be either written or oral, is defined under 15 U.S.C. § 77z-2(h)(1) inter alia as

> (A) a statement  containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items'
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission . . . .

The PSLRA created a "safe harbor," applicable to both the 1933 and the 1934 federal securities acts, for forward-looking statements that are either (1) "identified as a forward-looking statement . . . and [are] accompanied by meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the forward-looking statements" or (2) "immaterial."[22]   Section 27A, Securities Act of 1933, 15 U.S.C. § 77z-2(c)(1)(A); and the parallel provision, Section 21E, Securities Exchange Act of 1934, 15 U.S.C. § 78u-5(c)(1)(A).[23]

Because the statute does not define "material," courts have turned to the common law to construe the term in the statute. A misrepresentation or omission is "material" if it would be viewed by a reasonable investor as significantly altering the total mix of available information and thereby affect the reasonable investor's decision to buy or sell the company's stock. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Helwig v. Vencor, Inc., 251 F.3d 540, 555 (6th Cir. 2001)(en banc), petition for cert. filed, 70 USLW 3269 (Sept. 27, 2002 No. 01-538); Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000).  Courts have found statements immaterial as a matter of law, and therefore not actionable, where they are vague or general statements of optimism or about a company's progress and thus cannot be the basis for a fraud claim. See, e.g., Nathenson, 267 F.3d at 419; EP MedSystems, Inc. v. EchoCath, Inc., 135 F.3d 865, 872 (3d Cir. 2000)("Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and

---

[22] This inquiry should be made without examining the speaker's state of mind.  H.R. Conf. Rep. 104-369, at 54 (1995).

[23] The language of the two statutes' safe harbor provisions is the same, and therefore the Court has considered case law construing one to be applicable to the other.

instructions, or general statements of optimism, which 'constitute no more than puffery and are understood by reasonable investors as such.'"); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)(""Although questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage."); Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995)("Just as indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact, describing a company as 'recession-resistant' lacks the requisite specificity to be considered anything but optimistic rhetoric. Its lack of specificity precludes it from being deemed material; it contains no useful information upon which a reasonable investor would base a decision to invest."); Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)("Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."); Helwig v. Vencor, Inc., 251 F.3d at 555 ("[S]ales figures, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty").

An omitted fact may also be immaterial if it is trivial or if it is "so basic that any investor would be expected to know it." Basic, 485 U.S. at 231; Levitin v. PaineWebber, Inc., 159 F.3d 698, 702 (2d Cir. 1998), cert. denied, 525 U.S. 144 (1999). Moreover, under the "truth on the market" theory, a misrepresentation is immaterial if the information is already known to the market and therefore cannot defraud the market. Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000); Provenz v. Miller, 102 F.3d 1478, 1492 (9th Cir. 1996), cert. denied, 522 U.S. 808 (1997).

An "adequate cautionary warning" accompanying a forward-looking statement in effect renders any misrepresentation or omission relating to that statement immaterial. In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993), cert. denied sub nom. Gollomp v. Trump, 510 U.S. 1178 (1994). Since the statute fails to define "meaningful cautionary warnings," courts have differed as to what constitutes one. In an influential and pragmatic opinion, the Eleventh Circuit has concluded that Title 15 U.S.C. § 78u-5(c)(1)(A)(i) requires an accompanying warning, in order to be "meaningful," to mention some, but not all, "important factors that could cause actual results to differ materially from those in the forward-looking statement." Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999). Ivax relied upon the statement from H.R. Conf. Rep. No. 104-369 at 53 (1995), reprinted in 1995 U.S.C.A.A.N. at 742: "The cautionary statements must convey substantive information about factors that realistically could

cause results to differ materially from those projected in the forward-looking statement." According to the Eleventh Circuit, to constitute "meaningful cautionary language," an accompanying warning must advise an investor "of risks of a significance similar to that actually realized" so that the investor "is sufficiently on notice of the danger of the investment." Ivax, 182 F.3d at 807.

The Third Circuit has a more stringent requirement than the Eleventh: "Not just any cautionary language will trigger application of the [bespeaks caution] doctrine.[24] Instead,

_____

[24] The "bespeaks caution" doctrine, which provides a defense to securities fraud allegations, is a judicially created counterpart to the safe harbor provision in the PSLRA, which codified much of the prior common law, that developed prior to the PSLRA and survives today. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999). It protects from liability statements that are predictions or projections "that are accompanied by meaningful cautionary statements and specific warning of the risks involved, so as to 'bespeak caution' to investors that actual results may differ." Id. The influential Third Circuit opinion in the Trump case defined the common law doctrine of bespeaks caution, as follows:

> [W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

Id., 7 F.3d at 371. The bespeaks caution doctrine has been accepted in some form by every circuit court that has addressed it. Grossman, 120 F.3d at 1120-21 (and cases cited therein).
Courts dealing with the statutory safe harbor provisions routinely cite cases that apply the bespeaks caution doctrine on questions of whether a statement is "forward-looking" or whether the accompanying cautionary language is sufficiently meaningful. When forward-looking statements are accompanied by "sufficiently

specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect" the forward-looking statements are considered "immaterial." Grossman v. Novell, 120 F.3d 1112, 1120 (10th Cir. 1997). The doctrine "'provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.'" Id., quoting In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir. 1994), cert. denied, 516 U.S. 868 (1995)

In a pre-PSLRA case, the Fifth Circuit expressed some wariness of the "bespeaks caution" doctrine, noting that its application reflected "a relatively recent, ongoing, and somewhat uncertain evolution in securities law, an evolution driven by the increase in and the unique nature of fraud actions based on predictive statements." Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994). The doctrine

> has developed to address situations in which optimistic projections are coupled with cautionary language--in particular, relevant specific facts or assumptions--affecting the reasonableness of the reliance on and the materiality of these projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

Furthermore, the Fifth Circuit indicated,

> Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law. Rather, as we have proclaimed, "materiality is not judged in the abstract, but in light of the surrounding circumstances." The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Inclusion of cautionary language--along with disclosure of any firm-specific adverse facts or assumptions--is, of course, relevant to the materiality inquiry, for such inclusion or

- 69 -

disclaimers must relate directly to that on which the investors claim to have relied . . . . To suffice, the cautionary statements must be substantive and tailored to specific future projections, estimates or opinions" challenged by the plaintiff." Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 489 (3d Cir.), cert. denied, 513 U.S. 1032 (1994); Trump, 7 F.3d at 371 ("To suffice the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."). See also Rubinstein, 20 F.3d at 171 ("Factors such as the specificity and extensiveness of the cautionary language are relevant to [the appropriate] inquiry," i.e., "whether--given the timely inclusion of meaningful cautionary language within 'the total mix of information'--the omitted fact 'is one [that] a reasonable investor would consider significant in the decision to invest [or divest].'"); Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996)(to warrant protection under the bespeaks caution doctrine, "[t]he cautionary statements must be 'precise' and 'directly address[] . . . the [defendants'] future projections"), cert. denied, 522 U.S. 808 (1997).

Finally, the cautionary language need not appear in the same document as the forward-looking statement, but "remote

disclosure is part of the "total mix of information. Nevertheless, cautionary language as such is not per se dispositive of this inquiry. [footnotes and citations omitted]

Id. at 167-68.

cautions are less likely effective to qualify predictions contained in separate statements." Grossman v. Novell, Inc., 120 F.3d 1112, 1122, 1123 (10th Cir. 1997).

In the alternative, if there is meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the forward-looking statement that accompanies that forward-looking statement, to overcome a defendant's protection from liability under the PSLRA's safe harbor the plaintiff must demonstrate that the defendant made the statement "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 77z-2(c)(1)(B). The standard for this third test is thus much higher than the "severe recklessness" standard for complaints under § 10(b). It is this provision, along with the new § 21D(g) ("to preserve joint and several liability for persons who knowingly commit securities fraud . . . ."), which has led some courts to the conclusion that the PSLRA has injected a state-of-mind or scienter requirement into the Securities Act of 1933, which had imposed liability based on strict liability and negligence. See, e.g., Greebel, 194 F.3d at 200-01.

Therefore, in sum, if an issuer asserts a defense of the safe harbor for forward-looking statements, as here, it is shielded from liability if its statement meets any one of three, independent tests : (1) immateriality, which can be established in a number of ways; (2) accompaniment by meaningful cautionary statements, which render the statement immaterial; and (3) absence of actual knowledge by the speaker/issuer of the statement's falsity at the

time it is issued.  See, e.g., In re Harmonic, Inc. Sec. Litig., 163 F. Supp.2d 1079, 1087 (N.D. Cal. 2001); In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp.2d 371, 408 (S.D.N.Y. 2001); In re Lason, Inc. Sec. Litig., 143 F. Supp.2d 855, 860 (E.D. Mich. 2001).  As noted, Plaintiff has made clear that he will not challenge any forward-looking statements under the third prong.

In his previous complaint, Turner maintained that none of the accompanying cautionary language was sufficient to protect Defendants' statements.

The Court did not decide whether Defendants' statements in Turner's first amended complaint were protected under safe harbor on the grounds that they were accompanied by sufficiently meaningful cautionary language identifying important factors that could cause actual results to differ materially from those expressed in Defendants' forward-looking statements.  Because the Court observed that Turner's allegations were based on the same facts as those giving rise to the securities fraud allegations in the Kurtzman complaint, i.e., that they were false or misleading for the same reasons, it concluded under Melder, 27 F.3d at 1100 n.6, that Turner's complaint must meet the particularity-in-pleading requirement for pleading fraud under Rule 9(b).  Since there were obvious deficiencies in his earlier complaint under Rule 9(b) and in view of his argument that Defendants' forward-looking statements were not protected by the safe harbor's adequate cautionary language provision, the Court ordered Turner to replead with particularity and to assert facts demonstrating that each of

four forward-looking statements in the original complaint was false and misleading at the time it was made under 15 U.S.C. § 77z-2(c)(1)(B), i.e., that it was made with actual knowledge of its falsity, as is necessary under the "alternative" ("third prong") safe harbor provision, 15 U.S.C. § 77z-2(c)(1)(B), to give him an opportunity to defeat Defendants' motion to dismiss on this alternative ground.

### A. Defendants' Renewed Motion to Dismiss

Defendants' renewed motion to dismiss Turner's Second Amended Class Action Complaint first argues that the two new statements (A and B), both of which Compaq characterizes as forward-looking, should not be considered because (1) they are not newly discovered, but taken from Compaq's SEC filings, and (2) the Court did not direct Turner to expand the number of statements on which to sue, but to plead facts demonstrating actual knowledge that the original four were false when they were made.[25]

If the Court does consider the two new statements, Defendants urge that the pleading of both is deficient in several respects: (1) Plaintiff's allegations are not contrary to what the challenged statements actually say; (2) like the Kurtzman

---

[25] The Court agrees with Defendants that the two new statements are not appropriately raised here, where the Court has ordered Plaintiff to replead to cure deficiencies in his earlier complaint and where Plaintiff failed to ask leave of court to add them nor has he shown good grounds for being allowed to do so at this point in the litigation. Nevertheless, because dismissal is the harshest possible sanction, the Court examines the adequacy of the pleading of the new allegations.

Plaintiffs and for the same reasons, Turner has not pled sufficient facts under minimal pleading standards, and certainly not under Rule 9(b), to demonstrate that the statements were false when made, but instead improperly relies on hindsight and vague, ambiguous or conclusory assertions; (3) because both are forward-looking statements, within the meaning of the PSLRA safe harbor, and because for Section 11 liability to attach the statements must be false or misleading at the time the registration statement "became effective," they must be, but are not in the Second Amended Class Action Complaint, supported by sufficient factual pleading to show they were made with actual knowledge of falsity;[26] and (4) because Turner has disclaimed pleading actual knowledge, although Defendants contend that the new complaint still sounds in fraud, the safe harbor is an independent basis for dismissal of the two new statements.

Because the facts alleged by Turner previously and again in the Second Amended Class Complaint are the same as those underlying the Kurtzman complaint, this Court finds it difficult to view the Second Amended Complaint as grounded in anything but

---

[26] For instance, Defendants insist that because both new statements are forward-looking, there is no liability unless Plaintiff pleads sufficient facts to show that they were made with actual knowledge of their falsity. Even if the Court had not ruled that Turner's claims sounded in fraud and had to satisfy the third prong of the forward-looking statement test to avoid the safe harbor defense, the Fifth Circuit prior to passage of the PSLRA required under Rule 9(b) the pleading of detailed facts demonstrating that the statements were knowingly or recklessly false when made. Melder, 27 F.3d at 1100 & n.g; Tuchman, 14 F.3d at 1068-69; Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir. 1993).

fraud.  As Defendants point out, courts have held that boilerplate disclaimers of fraud are not dispositive of whether a claim under the 1933 Securities Act sounds in fraud.  See, e.g., In re Stac Elecs. Sec. Litig., 89 F.3d at 1405 n.2; In re American Bank Note Holographics, Inc. Sec. Litig., 93 F. Supp.2d 424 (S.D.N.Y. 2000); In re Anchor Gaming Sec. Litig., 33 F. Supp.2d 889, 893 (D. Nev. 1999).  Furthermore, in Lone Star, 238 F.3d at 368, the Fifth Circuit expressly reaffirmed its holding in Melder.  Contrary to Plaintiff's contention, Lone Star did not hold that boilerplate disclaimers of fraud would permit the Court to disregard fraud-based claims in the complaint.[27]  Here, as argued by Defendants, several of the allegations are intrinsically demonstrative of fraud:  i.e., that Compaq failed to reveal that the policies and programs it implemented regarding DEC "were calculated to reduce, rather than expand DEC's sales in 1999" (Complaint at par. 28); and that Compaq made a "partial disclosure" of the true situation in February 1999, but still concealed information such as its policy to reduce DEC sales while simultaneously issuing optimistic statements about the acquisition (id. at par. 23).  Nevertheless, because the Kurtzman plaintiffs and Turner have consistently filed separate complaints and should not be bound by each other's allegations, because the law is unsettled about the infusion of

---

[27] Defendants correctly summarize the holding in Lone Star, which was based on the specific facts in that case, as "where the complaint alleged incorrect financials based on the use of incorrect accounting rules, the allegations did not sound in fraud . . . and thus were not subject to the requirements of Rule 9(b)."  Reply (#89) at 20.

scienter by the PSLRA into the 1933 Act, and again because dismissal based on pleadings is a harsh sanction, the Court will give Plaintiff every opportunity to avoid dismissal and address the sufficiency of the complaint's pleading as if it were grounded in strict liability against the selling entity and tort against Pfeiffer and Mason individually. Therefore, the third prong ("actual knowledge of the falsity") for purposes of defeating the safe harbor defense will not be applied, and the Court examines whether Plaintiff has satisfied 15 U.S.C. § 77z-2(c)(1)(A) by pleading facts demonstrating that each forward-looking statement was material and lacked accompanying, meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.

Regarding Statement A, Defendants maintain that it does not make false representations or misleading omissions as Plaintiff claims and must show. On its face it merely states that (1) Compaq has established a variety of programs that are designed (2) to increase various efficiencies, (3) that such an increase depends on Compaq's ability to continue its successful working relationship with the reseller members of the channel, and (4) that such an increase is such efficiencies will allow Compaq to compete more effectively in its PC business. The statement does not proclaim success of the programs or the achievement of any increased efficiencies or increased competitiveness because of the programs. The statement is clear that "[c]ompetition is fierce," margins are

under pressure, and success of the programs "depends" on several future events, which may or may not happen.  Because Statements A and, as will be shown, B do not say what Plaintiff claims they say or imply, they are not actionable.  <u>Castlerock Management, Ltd. v. Ultralife Batteries, Inc.</u>, 114 F. Supp.2d 316, 324 (D.N.J. 2000)(to state a claim, plaintiffs must allege how a claimed omission renders the statement actually made false and misleading); <u>In re Technical Chems, Sec. Litig.</u>, 2000 WL 1222025, *8 (S.D. Fla. July 3, 2000)(court will not "parse out factual statements that, when read in context, do not convey what Plaintiffs assert"); <u>In re Alcatel Alsthom Sec. Litig.</u>, MDL Docket No. 1263, Sl. Op. at 18-19 (E.D. Tex. Nov. 19, 1999)(dismissing claim of false statement in prospectus because "[t]here is nothing in these paragraphs from which a reasonable investor could infer that Alcatel is warranting that the trading price for Alcatel's ADSs accurately reflects the 'true value' of Alcatel's ADSs").

Second, Defendants urge, Plaintiff's asserted reasons for Statement A's falsity (i.e., that Compaq "was continuing to lose a substantial amount of sales to direct competitors such as Dell" and the "hybrid sales model" used by Compaq was causing a "channel conflict"), are not only conclusory and unsupported by specific facts, but even if they are correct, they do not controvert the challenged statement that "<u>Compaq has established a variety of programs designed to increase its manufacturing, distribution, and business process efficiencies to enable it to compete more effectively in its PC business</u>."  At best, they merely suggest that

the programs were not yet successful or might not be achieved in the future.

Moreover, even if Turner had defined "channel conflict" in asserting that Compaq 's hybrid sales model was causing channel conflict and losing a substantial portion of sales to competitors like Dell, and even if the Court accepted this factually unsupported conclusion about Compaq's hybrid sales model, Defendants argue that these reasons also would not contradict the disputed statement, "Compaq has established a variety of programs designed to increase its manufacturing, distribution, and business process efficiencies to enable it to compete more effectively in its PC business." See, e.g., Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 794-95 (S.D.N.Y. 1997)(claim that prospectus was actionable because 1995 model of product differed from 1992 model rejected because inter alia there must be a "match" between the statement and the reasons given for why it is false in order for the statement to be actionable.).

Defendants contend that Statement B, a selection of sentences and phrases from Compaq's Form 10-K report for 1998, refers to the implementation of a new, transitional distribution model ("ODM") in 1998, before the Class Period. Defendants insist that these patched-together sentences and phrases, even taken out of context in this manner, do not say what Plaintiff claims, but merely identify two occurrences in 1998: (1) Compaq's accelerated movement toward the goal of implementing a build and configure-to-order distribution model, rather than a build-to-stock model, and

(2) a decrease in Compaq's revenues and gross margins as it moved toward that goal. There is no representation about the completion or success of Compaq's efforts, nor is it suggested that ODM was a direct distribution model. In fact, Defendants point out, elsewhere in the report, in a passage not quoted by Plaintiff, Compaq states that ODM had not yet been fully implemented and its success would depend on specific conditions in the future. 1998 Report on Form 10-K, Defs.' Appendix (#57), Ex. 4 at p. 23 ("The success of its programs to increase its business efficiencies depends upon Compaq's ability to continue its successful working relationship with its resellers, to maintain and increase its enterprise and service businesses, to both predict and react quickly to market responses by its competitors, and to continue the implementation of its optimized distribution model, the goal of which is to implement more efficient component supply, manufacturing and distribution strategies to increase overall efficiencies.")                          .

As for Turner's reason why Statement B is false, i.e., because Compaq's "goals of transition to an optimized direct distribution model had not been successful," Defendants assert that Compaq has never talked about an "optimized direct distribution model"; instead, Turner, himself, inserted the crucial word, "direct." Furthermore, the challenged sentences and phrases make no representations about ODM's success or its completion, but rather the portion of the report quoted above indicates that it was

not completed and that its success was conditioned on specifically enumerated factors.

As an independent ground for dismissal, Defendants further contend that Turner fails to demonstrate by pleading specific, contemporaneous facts indicating that the two new statements were false or misleading when the registration statement became effective because information known to the issuer at that time was omitted, essential for Section 11 liability. Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir. 1993); Castlerock Management, Ltd. v. Ultralife Batteries, Inc., 114 F. Supp.2d 316, 323 & n.5 (D.N.J. 2000). Instead, Turner merely pleads conclusory allegations that Compaq was continuing to lose sales to direct channel competitors like Dell and that its hybrid sales model was creating "channel conflict." These conclusory statements do not satisfy even Rule 8(a). Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994)("[A] plaintiff must plead specific facts, not mere conclusory allegations. . . . We will not accept as true conclusory allegations or unwarranted deductions of fact."). Defendants emphasize that Turner has failed to plead any facts regarding the nature and extent of the alleged "lost" sales. Nor does Plaintiff's vague reference to "channel conflict" constitute a well-pled allegation, supported by stated facts. Id.; Cooperman v. Individual, Inc., 171 F.3d 43, 47-48 (1st Cir. 1999)(only conclusions that are "logically compelled, or at least supported by stated facts . . . become 'facts' for pleading purposes"). Basic

allegations of fact must be pled to establish falsity. <u>Zucker v. Quasha</u>, 891 F. Supp. 1010, 1017-18 (D.N.J. 1995), <u>aff'd</u>, 82 F.3d 408 (3d Cir. 1996)(statement about terms of company's investments in two other entities and those entities' historical financial performance were not made misleading under Section 11 by alleged failure to disclose negative financial data where plaintiff failed to allege "any specific facts that directly support the claim that [the entities] were in 'precarious' financial condition when the public offering occurred"). Similarly, urge Defendants, statement B's "accelerat[ion of] the implementation" of ODM, pricing actions, and experience of short-term reduction in revenues to meet goals of that model cannot serve as well-pled contemporaneous facts revelatory of the falsity of the statements when the registration statement became effective. <u>See, e.g.</u>, <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1445 (5th Cir. 1993)(essential element of Section 11 claim is that the information allegedly omitted from the prospectus was known to the issuer at the time the prospectus was distributed); <u>Castlerock Management, Ltd. v. Ultralife Batteries, Inc.</u>, 114 F. Supp.2d at 323 & n.5; <u>Schoenhaut</u>, 986 F. Supp. at 790.

Finally, Defendants urge that the two new statements are protected by the PSLRA's safe harbor. Both are forward-looking statements because both allege that Compaq misrepresented its future prospects by failing to disclose factors which would result in a shortfall from projections and expectations. If Plaintiff structures his claims to be based on future happenings, he must be bound by pleading rules for forward-looking statements. <u>Harris v.</u>

Ivax, 998 F. Supp. 1449, 1453 (S.D. Fla. 1998)(holding that whether statements are forward-looking should be determined by their substance, not the "grammatical perspective" of the allegedly misleading statements), aff'd, 182 F.3d 699 (11th Cir. 1999). Both statements, according to Defendants, are a mix of unchallenged historical observations and forward-looking statements, and thus viewed as forward looking within the meaning of safe harbor. Ivaz, 182 F.3d at 806.

Defendants emphasize that although the past tense is used in statement A's "Compaq has established a variety of programs , , ," overall the statement is about the future--given the ongoing fierce competition, the "success of [Compaq's] programs . . . depends upon Compaq's ability to continue" certain initiatives in the future, including successful interaction with resellers, increasing its service business, predicting and reacting quickly to market responses by competitors, and implementing ODM. Even the sentence highlighted by Plaintiff and using the past tense relates to the future since the programs are designed to "enable" Compaq "to compete more effectively" in the future. Only in the future would one be able to determine whether the programs were successful. Defendants point out that Plaintiff, himself, treats the statement as forward-looking because he alleges that it was false since at some time after it was made, it became apparent (in hindsight) that the programs were proving unsuccessful, i.e., did not result in making Compaq more competitive. They note that

Turner has not alleged that the statement was false because Compaq never established the programs.

Similarly Statement B utilizes the past tense, but is also a mixed, and therefore forward-looking, statement because it expressly relates to a "transitional" year and to Compaq's implementation of ODM "towards the goal of moving from a build to stock operating model to a build-to-order/configure-to-order model." Complaint at par. 26 (emphasis added). In other portions of the document that Plaintiff does not quote, Compaq states that ODM's implementation was not complete and Compaq's business prospects partly depend upon continued implementation of ODM in the future. 1998 Report of Form 10-K, Defs.' App., Ex. 4 at p. 23. In essence the statement represents that in 1998 Compaq was working on implementing ODM with the aim of changing its distribution model, that the process is transitional, and that it is not complete nor have its objectives been fully realized. Plaintiff also treats this statement as forward-looking; he claims it was false because the "Company's goals of transition to an optimized direct distribution model had not been successful," as evidenced by an "admission" one year later (again in hindsight) that Compaq had yet to complete the transition to a direct sales model. Complaint at par. 27.

Plaintiff's Response

Plaintiff maintains that none of the statements is forward-looking and that they all were materially misleading or

omitted material facts existing at the time they were made.  Turner notes that this Court stated that "disclosures of historical fact must not only be technically accurate, but must also not be misleading and must be updated if material information learned later would make them misleading."  He cites In re Compaq Securities Litig., 848 F. Supp. 1307, 1319 (S.D. Tex. 1993) and Rubinstein, 20 F.3d at 170 (a duty to speak the full truth arises when a defendant undertakes a duty to say anything).  The Court observes that Turner, in voluntarily waiving the opportunity to plead that Defendants had actual knowledge of the statements' falsity under the third prong of the safe harbor, essentially admits that he cannot plead facts showing that they knew at the time that the statements purportedly needed modification or updating.

### Court's Ruling

First, now that Plaintiff has had another opportunity to replead and both parties have been able to submit the documentary evidence they consider relevant, providing the Court with a view of the total mix of information available about investing in Compaq stock during the Class Period, Court reconsiders the puffery challenge raised by Defendants in their first motion to dismiss. Referencing the discussion supra of vague statements of corporate optimism in the context of acquisitions and mergers on pages 51-57 of this memorandum and order, the second amended complaint and the documentary evidence in the record, the Court concludes that

Statements 1 and 4 are not material, but obvious corporate puffery upon which a reasonable investor would not rely. Therefore they are non-actionable.

Moreover, statement 2 is similarly a vague optimistic statement, lacking in specificity, not capable in its generality of any objective verification nor calculable with any certainty. The Court finds that it, too, constitutes immaterial corporate puffery upon which a reasonable investor would not rely and that it is therefore not actionable.

Compaq also emphasized that risks that are matters within the general knowledge of investors do not require explicit warnings. In re Donald Trump Casino Sec. Litig., 793 F. Supp. 543, 562 (D.N.J. 1992)("there is no obligation under the securities laws . . . to set forth information which is public and which a reasonable investor ought to be held accountable for knowing"), aff'd, 7 F.3d 357 (3d Cir. 1993), cert. denied sub nom. Gollomp v. Trump, 510 U.S. 1178 (1994); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989)(Issuer "need not disclose the hazards of its business, hazards apparent to all serious observers and most casual ones"). Given the indefiniteness and generality of statements 1, 2, and 4, the Court agrees that such statements could reasonably be discounted by the investors' general knowledge, but their fatal lack of specificity cannot even support that conclusion with certainty.

Moreover, even if these statements were not immaterial corporate puffery, but were presumed by the Court to be

sufficiently specific and capable of objective verification for a reasonable investor to attach importance to them, this Court has already found statements 1,2, and 4 to be forward-looking. Moreover, the Court concurs with Defendants' analysis that A and B should also be so characterized for purposes of the PSLRA's safe harbor. Where a review of the entire statement, beyond an isolated line or phrase, demonstrates that it is a mixed statement, containing both historical observations and prognostications based on those observations, the entire statement qualifies as forward-looking for safe harbor purposes.    Ivax, 182 F.3d at 806-07 (holding that "when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement")[28]; Ehlert v. Singer, 245 F.3d 1313, 1317-18 (11th Cir. 2001); In re Champion Enterprises, Inc. Sec. Litig., 144 F. Supp.2d 848, 864-65

---

[28] Given investors' need for disclosure of soft as well as hard information about a company, the Eleventh Circuit effectively explained its decision to characterize mixed statements as forward-looking on the grounds that "extrinsic sources of congressional intent" demonstrate that "Congress enacted the safe harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company. . . . Forward-looking statements often rest both on historical observations and assumptions about future events. Thus, were we to banish from the safe harbor lists that contain both factual and forward-looking factors, we would inhibit corporate officers from fully explaining their outlooks. Indeed, liability-conscious officers would be relegated to citing only the factors that could individually be called forward-looking. That would hamper the communication that Congress sought to foster." Id. at 806, citing H.R. Conf. Rep. 104-369, at 42 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 741.

(E.D. Mich. 2001).  Like the Fifth Circuit addressing the bespeaks caution doctrine in <u>Rubinstein</u>, 20 F.3d at 167 ("[T]he 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context."), the Eleventh Circuit in <u>Ivax</u> concluded that under the safe harbor provision the challenged statements needed to be read in context.  <u>Ivax</u>, 182 F.3d at 806.

In addition, even if the Court had determined that statements 1, 2, and 4 were not immaterial and mere puffery, but instead forward-looking and actionable, the Court further finds that Compaq has previously demonstrated that all the challenged statements were accompanied by meaningful cautionary language that addressed the specific problems that Plaintiff has targeted, as pointed out by Compaq in its initial motion to dismiss:

<u>Warnings in Compaq's Third Quarter Report on Form 10-Q, filed on November 11, 1998</u> (Defs.' Appendix, Ex. 5), which were repeated a number of times during the Class period in Compaq's statements and in analyst materials[29]:

- Compaq participates in a highly volatile industry that is characterized by fierce industry-wide competition for market share. Industry participants confront aggressive pricing practices, continually changing

---

[29] Plaintiffs point out that the January 27, 1999 PaineWebber report, cited in their complaint at ¶ 49 to show how "Defendants' . . . statements about strong demand in 1999 were relied upon by the market"), in fact plainly disclosed that "Compaq investments contain a high level of risk from fast changes in technology, industry conditions and competitive pressure."  Def. App., Ex. 9.
  Plaintiffs also quote from a February 2, 1999 BancBoston report, cited in their Complaint at ¶ 49, from a section entitled "Investment Risks":  "Among the risks is the ever-present fear of a decline in PC demand.  Historically this has resulted in price wars aimed at holding market share and alleviating rising inventories.  In turn, these pricing moves have led to significant industry losses."  Def. App., Ex. 13.

customer demand patterns, growing competition from well capitalized high technology and consumer electronics companies, and rapid technological development carried out in the midst of legal battles over intellectual property rights and the application of intellectual property laws. (p. 23)

- Competition remains fierce in the information technology industry with a large number of competitors vying for market share. Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (id.)

- [Compaq] sells directly to end users in its high-end business and its service business . . . [and] [t]he success of its programs to increase its business efficiencies depends upon Compaq's ability to continue its successful working relationship with its resellers. (Id.; also 1998 Report on Form 10-K, filed Feb. 23, 1999, Def. App. 6 at 23)

- In managing production, Compaq must forecast customer demand for its products. . . . Should it overestimate the supplies needed to meet customer demand, cash and profitability could be adversely affected. (id. at 25)

- In the event of . . . lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions, or component pricing movements, there could be an adverse impact on . . . cash and related profitability. (id. at 24)

- Compaq works with third parties in strategic alliances to facilitate product offerings, product development and compatibility, in various manufacturing, configuring and shipping capacities and as suppliers of components and services in non-core competencies. . . . [T]hese relationships lead to a number of risks. First, these companies may suffer financial or operational difficulties that affect their performance, which could lead to

delays in product announcements or gaps in component supplies. (<u>id.</u>)

- Should Compaq be unable to sell the inventory of older products at anticipated prices, should it not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be resulting adverse impact on sales, gross margins and profitability. (<u>id.</u> at 25)

- In planning product transitions, [Compaq] evaluates the speed at which customers are likely to switch to newer products. . . . Because of the lead times associated with its volume production, should Compaq be unable to gauge the rate of product transitions accurately, there could be an adverse impact on inventory levels, cash, and profitability. (<u>id.</u>)

<u>Warnings from Compaq's 1998 Report on Form 10-K, Defs.' App., Ex. 6), filed on February 23, 1999</u> and repeating the above warnings also:

- From time to time, Compaq has experienced significant price increases and limited availability of certain components that are available from multiple sources. At times, Compaq has been constrained by parts availability in meeting product orders and future constraints could have an adverse effect on Compaq's operating results. (p. 8)

- Compaq's hardware products are sold to large and medium business and government customers primarily through dealers, value-added resellers and systems integrator and to small business and home customers principally through dealers and customer channels. In response to changing industry practices and customer preferences, Compaq is continuing its expansion of distributions establishments. Compaq also sells hardware products directly through its sales force and to small businesses and home customers through Compaq's internet web page at www.compaq.com as well as through its mail order business. (<u>Id.</u>)

- The computer industry is intensely competitive with many U.S., Japanese and other international companies vying for market share. (Id. at 10)

- The principal elements of competition are product performance, product quality and reliability, service and support, price, marketing and distribution capability and corporate reputation. While Compaq believes that its products and services compete favorably based on each of these elements, Compaq would be adversely affected if its competitors introduce innovative or technologically superior products, offer a more attractive combination of products and services, or offer their products at significantly lower prices than Compaq. (Id.)

- Competition creates an aggressive pricing environment, which continues to put pressure on gross margins. (Id. at 23)

- In the event of a drop in worldwide demand for computer products, lower-than-anticipated demand for one or more of Compaq's products, difficulties in managing product transitions or component pricing movements, there could be an adverse impact on inventory levels, cash and related profitability. (Id. at 23).

- While Compaq has increased its service revenue through [the Digital] acquisition, there are risks associated with the service business, which include jeopardizing Compaq's long-term relationships with third-party resellers while it provides services directly to end-user customers. (Id.)

Compaq believes that the Digital acquisition will enhance its operating results, but as with any significant acquisition or merger, it confronts challenges in . . . synchronizing product roadmaps and . . . marketing . . . to achieve greater efficiencies. (Id.)

-Compaq continues to focus on making business and information management processes more efficient in order to

increase customer satisfaction, improve productivity and lower costs. . . . Integrating the systems at Digital and Tandem complicates this process. Should the transition to new systems not occur in a smooth and orderly manner, Compaq could experience disruptions in operations, which could have an adverse financial impact. (Id.)

- To ease product transitions, Compaq carries out pricing actions and marketing programs to increase sales by resellers. It provides currently for . . . price protection that may occur under reseller programs and under floor planning arrangements. . . . [S]hould [Compaq] . . . not anticipate pricing actions that are necessary, or if dealers hold higher than expected amounts of inventory subject to price protection at the time of planned price reductions, there could be a resulting adverse impact on sales, gross margins, and profitability. (Id. at 23-24; see also Third Quarter 1998 Report on Form 10-Q, filed Nov. 11, 1998, Ex. 5 at 25)

- Compaq's operating results could be adversely affected should Compaq be unable to . . . anticipate customer demand accurately. (Id. at 57)

- In the event that a supply of key single-sourced material process or component parts were delayed or curtailed, Compaq's ability to ship the related product in desired quantities and in a timely manner could be adversely affected. (Id.)

Compaq's operating results could be adversely affected should Compaq be unable to successfully integrate acquired entities. (Id.)

CNBC Interview of Earl Mason

- Well, our gross margins continue to go up. We view that process to continue in 1999. Some of the reasons they're going up is further integration of [Digital] and of course we've made good progress on that.

But we have more work to do yet, before we're finished. (Defs.' App. Ex. 8)[30]

Feb. 16, 1999 International Press Briefing by Andreas Barth

- [W]e've achieved most of the integration. [But] [t]here are some things, like the profit alignment, that we still need to do. And then the cultural integration, which will only take long-term . . . . Defs.' App., Ex. 14.

- [W]e've made huge progress as I said on the Digital integration, but obviously we need to complete that fully for the things that are still open there, do them, complete them, get that behind us, because then we can fully, fully reap the benefit of all of the advantages, products, solutions, services" (Id.)

See Memorandum of Law (#53) at pp. 18-25. These warnings demonstrate, contrary to Turner's allegations, that Compaq did not conceal the specific risks arising from competition, erroneous forecasting of end-user demand, impact of supply constraints and reliance on third-parties for supply of component parts, Compaq's multi-channel distribution system of both direct and indirect sales, contra-revenues paid to resellers when competition or introductions of new products forced them to lower their prices, and the ongoing integration of Digital that posed continued risks to anticipated sales, growth, and profitability. These cautionary warnings are meaningful, i.e., they advised investors of risks of a significance similar to those Plaintiff alleges actually

---

[30] See also January 27, 1999 Bloomberg article, cited at ¶ 46 of Complaint, following Compaq's announcement of fourth quarter 1998 results: "They're starting to see some synergies in terms of expenses, but growing the [Digital] part of the business hasn't happened yet." Def.'s App., Ex. 7.

materialized and thus the Court finds that the cautionary language put reasonable investors on notice of the potential that such happenings could occur.  Moreover, the Court finds the warnings were remarkably and specifically tailored to the basic kinds of risks and uncertainties that Plaintiff claims were realized in Compaq's downturn during the Class Period.  This meaningful cautionary language renders the statements immaterial and therefore protected by the safe harbor under the PSLRA, and it is a very substantial factor in the "total mix of information" available in this litigation for the Court's determination of the materiality of the challenged statements under the bespeaks caution doctrine under <u>Rubinstein</u>.

Moreover, Plaintiff has essentially conceded that he cannot plead sufficient facts to constitute well pled allegations that Defendants had actual knowledge of the falsity of these statements when the registration became effective.  The Court has earlier in this memorandum and order found that the Kurtzman complaint's generic, conclusory allegations, unsupported by sufficient specific facts, do not raise any strong inference of even severely reckless misconduct on the part of Defendants, no less actual knowledge, for purposes of the Kurtzman Plaintiffs' section 10(b) fraud claims.  Turner has pled nothing additional for his claim under the 1933 Act.

Looking at all the allegations pled by Turner, in particular statements A and B, since they are the only ones with any specificity to attract attention by a reasonable investor, this

Court fully concurs with Defendants that Plaintiff has failed to show that A and B say what Plaintiff claims they say, and are thus dismissible under Rules 8(a) and 12(b)(6).  The Court also agrees that Plaintiff has not met his burden to allege how statements A and B, viewed in their entirety, on their face, were false representations when made or constituted misleading omissions that were material to investors' decisions whether to buy or sell stock.

For all these reasons, the Court

ORDERS that Defendants' motion to dismiss Turner's Second Amended Class Action Complaint is GRANTED.

SIGNED at Houston, Texas, this **30**$^{th}$ day of March, 2002.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE